259 P.3d 569

Michael RAY, Individually and as Next Friend for Alyssa Ray, a minor, and Debbie Ray, Plaintiffs–Appellees/Cross–Appellants,

v.

KAPIOLANI MEDICAL SPECIALISTS; Defendant–Appellant/Cross–Appellee,

and

Kapiolani Medical Center for Women and Children, Defendant.

No. 29988.

Supreme Court of Hawai'i.

July 21, 2011.

Reconsideration Denied Aug. 10, 2011.

Kenneth S. Robbins of Robbins and Associates (John–Anderson L. Meyer and Sergio Rufo of Robbins & Associates and Andrea M. Gauthier of Horvitz & Levy LLP, with him on the briefs) for Defendant–Appellant/Cross–Appellee Kapiolani Medical Specialists.

Robert S. Peck of the Center for Constitutional Litigation, P.C., pro hac vice, (Collin M. (Marty) Fritz and Allen K. Williams of Trecker & Fritz, Philip Russotti of Wingate, Russotti & Shapiro, LLP, pro hac vice, and Margaret C. Jenkins with him on the briefs) for Plaintiffs–Appellees/Cross–Appellants.

Girard D. Lau, Solicitor General, Kimberly Tsumoto Guidry and Deirdre Marie–Iha, Deputy Solicitors General, for Amicus Curiae Attorney General of the State of Hawai'i.

Arthur F. Roeca, April Luria, and Jodie D. Roeca of Roeca, Louie & Hiraoka for Amicus Curiae Hawai'i Medical Association and American Medical Association.

RECKTENWALD, C.J., NAKAYAMA, DUFFY, and McKENNA, JJ., and Circuit Judge WILSON, in place of ACOBA, J., recused.

Opinion of the Court by NAKAYAMA, J.

This appeal stems from an incident where Alyssa Ray ("Alyssa"), who has lupus, received treatment from Dr. Kara Yamamoto ("Dr. Yamamoto"), an employee of Kapi'olani Medical Specialists ("KMS"). Michael and Debbie Ray brought this action in the Circuit Court of the First Circuit (circuit court) against KMS for negligent treatment and failure to obtain informed consent. The jury found that Dr. Yamamoto's treatment of Alyssa was negligent, but that it was not a legal cause of Alyssa's injuries. The jury also found that Dr. Yamamoto failed to properly inform the Rays, and that her failure was a legal cause of Alyssa's injuries. The circuit court granted judgment as a matter of law in favor of the Rays on their negligent treatment claim, and entered judgment in favor of the Rays for a total of $4,525,000. KMS appealed, asserting in part that the circuit court erred by granting judgment as a matter of law in favor of the Rays on negligent treatment, denying its motion for judgment as a matter of law on informed consent, and admitting the testimony of Dr. Bram Bernstein ("Dr. Bernstein") that Hawaii's informed consent law required Dr. Yamamoto to inform the Rays of her and the medical community's experience with the proposed treatment. For the following reasons, we hold that: 1) the circuit court erred by granting judgment as a matter of law in favor of the Rays on their negligent treatment claim, and a new trial is required because the negligent treatment and informed consent verdicts are irreconcilable; 2) the circuit court did not err by denying KMS' motion for judgment as a matter of law on the issue of informed consent; and 3) the circuit court erred by admitting Dr. Bernstein's testimony and failing to adequately cure the error. Therefore, we vacate the circuit court's judgment and remand for a new trial. In light of this conclusion, it is unnecessary to address KMS' remaining points of error and the points of error raised in the Rays' cross-appeal.[1]

## I. BACKGROUND

### A. Factual and Procedural Background

In December 2003, the Rays were on vacation in Honolulu. Prior to their vacation,

---

1. KMS also asserts that the circuit court erred by allowing rebuttal a sanction. In their cross-appeal, the Rays assert that: 1) the "court below erred in failing to grant a new trial based on an ambiguous jury may have mixed its award for physical pain and suffering with other forms of compensatory damages, resulting in [a] reduction of the verdict not authorized by law[;]" 2) the "court below erred when it declined to declare the cap imposed under Haw.Rev.Stat. [(HRS)] § 663–8.7 unconstitutional and amend the judgment to reflect the jury's proper verdict[;]" and 3) the "court below erred when it declined to award prejudgment interest from the date Alyssa first suffered her serious and debilitating complication (January 2005) until the date of trial."

Alyssa, who was fourteen years old at the time, had developed rashes, sores, and shaky movements. These symptoms worsened on their vacation, and the Rays took Alyssa to Kapiʻolani Medical Center for Women and Children ("KMCWC"). An MRI revealed that Alyssa had brain lesions.

### 1. *Dr. Kara Yamamoto's treatment*

Dr. Yamamoto was consulted on December 24, 2003, regarding Alyssa's condition and concluded that Alyssa had severe lupus with brain involvement. Lupus is a disease that involves the inflammation of any part of the human body. Lupus patients with brain involvement have a higher risk of dying.

Dr. Yamamoto discussed possible treatments with the Rays and proposed a four-week intravenous pulsing regimen using the medication Solu–Medrol. The plan called for Alyssa to receive one gram of Solu–Medrol a day for three consecutive days, followed by a maintenance dose of forty milligrams of Prednisone on the four off days. She was to repeat this process for four weeks. Dr. Yamamoto explained to the Rays that the steroid treatment was effective at reducing inflammation. She also explained that steroids carried the risk of steroid myopathy, a form of muscle weakness. She gave the Rays an informational pamphlet indicating that the risks of side effects from steroids generally increase with a higher dosage. Dr. Yamamoto did not believe that lower doses of steroids would control Alyssa's disease and did not advise the Rays of alternative dosing regimens.

Alyssa began her first series of pulses on December 25. Alyssa's condition quickly improved, and she was discharged on December 29, 2003, with instructions to receive the remaining three weeks of pulses as an outpatient.

Alyssa received the second series of pulses between December 31 through January 2, and Dr. Yamamoto noticed that Alyssa's symptoms had improved greatly, although she still had some mouth sores, residual left-sided weakness, and rashes. She received her third series of pulses between January 8

through January 10, 2004, and several days later began experiencing significant muscle weakness. On January 13, 2004, Alyssa saw Dr. Yoshio Futatsugi ("Dr. Futatsugi"), who thought the weakness could be due to steroids, but could not confirm it. Alyssa saw Dr. Yamamoto the next day, and Dr. Yamamoto stated that she thought the weakness might be due to the lupus. On January 15, 2004, Alyssa had an MRI taken that showed she had a new brain lesion. Dr. Yamamoto agreed with Alyssa's mother not to give the fourth series of pulses, and Alyssa was readmitted to KMCWC on January 17. Shortly thereafter, Alyssa was transported to New York Presbyterian Hospital.

### 2. *Alyssa's condition in New York*

Dr. Thomas Lehman ("Dr. Lehman") assumed care over Alyssa when she arrived in New York, and after running tests, concluded that Alyssa's muscle weakness was caused by the high doses of steroids she received rather than her lupus. Alyssa's condition worsened and she lost muscle strength. Her muscle weakness progressed from her hips and shoulders to her hands and legs. Alyssa returned home after approximately six months in a rehabilitation hospital, and has limited use of her hands and feet.

### 3. *Instant lawsuit*

In July 2003, the Rays, individually and as next friend for Alyssa, filed a complaint alleging negligent treatment and failure to obtain informed consent against KMS and KMCWC.[2]

### 4. *Testimony concerning causation*

With respect to the cause of Alyssa's injuries, the parties adduced the following relevant testimony. Dr. Yamamoto testified that she eventually concluded that the weakness Alyssa developed after the third series of pulses was from the steroids she administered.

The court played the video deposition of Dr. Lehman. He said he needed to ascertain the cause of Alyssa's weakness in order to effectively treat her. He initially suspected

2. The claims against KMCWC were dismissed with prejudice.

that the large amount of steroids that Alyssa received probably caused her muscle weakness, because it is well known that steroids can cause myopathy while lupus does not result in "diffuse weakness." After running tests, he determined that Alyssa's weakness was caused by the steroids she received at KMS.

After being discharged from New York Presbyterian Hospital, Dr. Anne Liebling ("Dr. Liebling") later assumed care of Alyssa at Gaylord Rehabilitation Hospital. When Dr. Liebling first encountered Alyssa on May 7, Alyssa could not breathe on her own, was "profoundly weak," and was "severely limited in her ability to move." Dr. Liebling ascertained the cause of Alyssa's weakness in order to effectively treat Alyssa and determined that the steroids Alyssa received at KMS caused her weakness.

Dr. Liebling also testified that she consulted with a neurologist, Dr. Jonathan Goldstein, who determined that the weakness was not related to her lupus. Alyssa was also treated by Dr. Gerstenhaber at Gaylord, and Dr. Gerstenhaber concluded that Alyssa was suffering from steroid myopathy. Dr. Liebling testified that Dr. Rose Malfa, an attending physician at Gaylord, concluded that Alyssa had steroid myopathy.

At trial, the Rays called Dr. Moris Danon ("Dr. Danon") as an expert in neurology and muscle pathology. Dr. Danon examined Alyssa prior to trial in August. He concluded that "it's fairly obvious that [Alyssa's] weakness occurred because of the steroid administration." He based his opinion on his examination of Alyssa and Alyssa's medical records. Dr. Danon concluded that Alyssa's muscle weakness was permanent. Dr. Danon opined that the nine grams of Solu-Medrol given by Dr. Yamamoto caused Alyssa's acute steroid myopathy to a reasonable degree of medical certainty.

Numerous witnesses testified that lupus was typically treated with steroids, but that there was not a "set protocol" for the dose of steroids. Dr. Lehman testified that he had never heard of a case of permanent muscle weakness resulting from steroid myopathy.

Dr. Yamamoto testified that she was taught about steroid treatment from Dr. Chester Fink ("Dr. Fink"). Dr. Marilynn Punaro ("Dr. Punaro") testified that she had worked with Dr. Fink and applied the "three pulses" treatment to hundreds of patients, and that she had only seen a small number of patients develop life-threatening side effects. She testified that, in the hundreds of patients she had treated using this method, she "never encountered any muscle weakness that [she] thought was induced by the treatment[.]" Dr. Punaro also testified about a study which used Solu-Medrol more aggressively than Dr. Yamamoto. The 213 patients in that study did not suffer acute steroid myopathy. Dr. Punaro testified that she had not examined Alyssa's medical records and was not commenting on whether Alyssa suffered steroid myopathy.

In her deposition testimony, which was played for the jury, Dr. Pascual testified that she had not seen any of her patients using the three pulse steroid treatment develop permanent distal muscle weakness. Dr. Pascual also testified that she had not examined Alyssa's medical records and that she was not opining as to what caused Alyssa's injuries.

### 5. Testimony concerning informed consent

The Rays conceded that Dr. Yamamoto advised them that steroids can cause myopathy and that Dr. Yamamoto was not required to warn them of permanent steroid myopathy. Instead, the Rays claimed that Dr. Yamamoto should have advised of lower dose options. The following relevant testimony was introduced regarding the failure to inform of alternative doses of steroids.

Dr. Bernstein testified that he had never seen the treatment plan proposed by Dr. Yamamoto. He testified that there were different ways of treating a lupus patient with steroids: 1) giving the initial three grams of steroids, and then "back[ing] off immediately and perhaps put[ting] the patient on a small dose of Prednisone or Solu-Medrol daily[;]" 2) giving the first three grams, and then giving one gram a week for several weeks in a row; and 3) giving three grams in the first

week of a month, and then repeating once a month; and 4) not using pulses at all, but giving regular maintenance doses. He testified that these were recognized alternatives because they had been peer reviewed and published in textbooks. Dr. Bernstein testified that the lower doses of steroids were less risky and that the risk of steroids is proportionate to the dose given.

Dr. Kurahara, the Chief of Pediatric Rheumatology at KMS, testified that one gram of steroids for three days in a row to treat severe lupus is a recognized alternative treatment, and that doctors are required to inform patients of alternative treatments.

Dr. Lehman testified that one gram for three days repeated monthly was a different therapy than Dr. Yamamoto's treatment. He testified that there were a variety of standard treatments for lupus, but no universal treatment method.

Dr. Yamamoto also acknowledged that Dr. Elga Rabinovich testified in her deposition that most pediatric rheumatologists in the United States would give three grams the first week, followed by one gram in each of the next three weeks. Dr. Yamamoto admitted that this method was a reasonable method of treatment, which had potentially less risk from steroids.

6. *Testimony concerning a physician and medical community's experience with a treatment option*

Dr. Bernstein testified that a physician should tell the patient about the physician and medical community's lack of experience with a treatment option. Defense counsel objected to this testimony, but the trial court allowed Dr. Bernstein to continue testifying on that subject. Before proceeding, the trial court issued the following warning:

All right. Ladies and gentlemen before Dr. Bernstein continues testifying, I have some directions for you.

*And as you've been told from the beginning of this trial, when I say something you got to follow it.*

*You're going to be getting an instruction from me at the end of this case on in-* *formed consent because it's one of the claims of the plaintiffs here.*

*You're going to be getting a specific instruction on what informed consent is. It's going to have a number of specific elements as to what a doctor specifically has to tell a patient in order to fulfill the doctrine of informed consent in Hawai'i, in this jurisdiction, and that is the law that you're going to have to follow as the jury in this case.*

The reason I'm instructing you now specifically is because Dr. Bernstein, in response to some of [plaintiff counsel]'s questions now, is talking about informed consent, and in his opinion what it requires, what he would tell the patient, et cetera, et cetera.

*I'm going to allow him to answer those questions for the most part because he has been qualified as a doctor in this area.*

*It's going to be your job to take his testimony, along with the testimony of all the other witnesses that you hear, that I admit into evidence, and the documents, et cetera, and put that together with the law I give you and follow the law, okay.*

So I want that really clear to you, and I think it is at this point.

(Emphasis added.)

Dr. Bernstein testified that "a very important part of informed consent is for the doctor to tell the patient or the parents what his or her experience has been with that form of treatment." The court denied KMS' motion for mistrial, or in the alternative, to strike the testimony.

The Rays testified that they would not have consented to Dr. Yamamoto's treatment had they known of Dr. Yamamoto and the medical community's lack of experience with her treatment procedure.

Dr. Danon testified that:

[Plaintiff's counsel]: All right, doctor, one last question for you. *I'd like you to assume that Dr. Bernstein, pediatric rheumatologist, gave his opinion, testified in court that it was a deviation from standard of care that Dr. Yamamoto did not provide sufficient information to the parents to allow them to make an informed*

*consent to the protocol, the nine grams of Solu–Medrol, and that had, assume further, that had they been so informed they would not have agreed to that.*

Now tell me if you have an opinion to a reasonable degree of medical certainty whether or not that failure to provide informed consent was a substantial factor in causing the steroid myopathy, the resulting condition Alyssa has?

A. If it's assumed by Dr. Bernstein, that's a—

Q. No, I'm asking you to assume. You have to assume that. You assume that. Was it a substantial factor in causing the myopathy and resulting condition?

A. *Well, the steroids were substantial reason to cause the myopathy.*

Q. All right. So is the answer yes?

A. Yes.

Q. Why do you say that?

A. Because of—there's no other evidence that anything else caused the myopathy.

(Emphasis added.)

The circuit court later precluded the Rays from arguing that Dr. Yamamoto did not properly inform them by failing to disclose her experience with the treatment. The circuit court struck Dr. Bernstein and the Rays' testimony regarding Dr. Yamamoto and the medical community's experience with Dr. Yamamoto's treatment. The circuit court refused to strike Dr. Danon's testimony because the question encompassed all of plaintiffs' theories about informed consent and the question did not parse out Dr. Yamamoto's personal experience with the protocol. The circuit court provided the following instruction prior to closing arguments:

You have heard testimony on the issue of informed consent from the plaintiffs' expert witness, Dr. Bram Bernstein, that in his opinion, among other things, Dr. Kara Yamamoto was required to inform Alyssa Ray's parents specifically about both the extent of her personal experience and of the medical community in general with the steroid treatment protocol which she used to treat Alyssa in this case. This specific testimony by Dr. Bernstein is

stricken from the record and you are hereby instructed to disregard it on the issue of informed consent.

Likewise, any testimony from Michael and Debra Ray in which they stated that if informed by Dr. Yamamoto specifically about the extent of her personal experience and of the medical community in general with the subject steroid treatment protocol, they would not have consented to its use in treating Alyssa is stricken from the record and you are hereby instructed to disregard it on the issue of informed consent.

During closing arguments, defense counsel referred to the above instruction.

### 7. *Verdict and renewed motion for judgment as a matter of law*

On February 23, 2009, the jury returned its special verdict. The jury found that Dr. Yamamoto was negligent in her treatment of Alyssa, but that her negligence was not a legal cause of the plaintiffs' injuries. The jury also found that Dr. Yamamoto failed to properly inform the Rays, and that her failure to do so was a legal cause of the plaintiffs' injuries. The Rays moved for judgment as a matter of law on the issue of causation on their negligent treatment claim, and the circuit court granted the motion on the grounds that: 1) given the evidence adduced at trial, a reasonable juror could not have answered this question "no;" and 2) the verdict was irreconcilable. The jury awarded the Rays a total of $6,150,000 in damages.

### 8. *Judgment, post-judgment motions, amended judgment, and appeal*

On March 25, 2009, the trial court entered its judgment, *sua sponte* awarding the Rays $4,525,000 to reflect the adjustment of Alyssa's pain and suffering damages from $2 million to $375,000 "in accordance with" HRS § 663–8.7 (1993). The court denied KMS' motion for a new trial and renewed motion for judgment as a matter of law. On April 6, 2009, the Rays filed three motions: 1) a motion to amend the circuit court's judgment claiming that HRS § 663–8.7 is unconstitutional, 2) a motion for a new trial on dam-

ages, and 3) a motion to amend the judgment to add prejudgment interest. The circuit court denied these motions following a hearing on July 7, 2009. On July 17, 2009, the circuit court entered an amended judgment awarding the Rays costs against KMS and dismissing KMCWC from the case. KMS subsequently appealed from the judgment, the denial of KMS' post-judgment motions, the award of costs, and the amended judgment. The Rays cross-appealed from the denial of their post-judgment motions.

The Rays applied for a mandatory and discretionary transfer from the Intermediate Court of Appeals (ICA) to this court of their cross-appeal from the circuit court's March 25, 2009, judgment on their complaint for medical malpractice. On April 19, 2010, this court entered an order accepting the Rays' application for transfer pursuant to HRS § 602–58(b)(1) (Supp.2010). Oral argument was held on October 21, 2010.

## II. STANDARDS OF REVIEW

### A. Judgment As a Matter Of Law

■ A trial court's ruling on a motion for judgment as a matter of law is reviewed *de novo. Miyamoto v. Lum,* 104 Hawai'i 1, 6–7, 84 P.3d 509, 514–15 (2004) (citing *In re Estate of Herbert,* 90 Hawai'i 443, 454, 979 P.2d 39, 50 (1999)). "A [motion for judgment as a matter of law] may be granted only when after disregarding conflicting evidence, giving to the non-moving party's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in the non-moving party's favor, it can be said that there is no evidence to support a jury verdict in his or her favor." *Id.* at 7, 84 P.3d at 515 (block quote formatted omitted) (quoting *Tabieros v. Clark Equipment Co.,* 85 Hawai'i 336, 350, 944 P.2d 1279, 1293 (1997)).

### B. Questions of Law

■ "Questions of law are reviewed de novo under the right/wrong standard." *Gump v. Wal–Mart Stores, Inc.,* 93 Hawai'i 417, 420, 5 P.3d 407, 410 (2000) (quoting *Roes v. FHP, Inc.,* 91 Hawai'i 470, 473, 985 P.2d 661, 664 (1999)).

### C. Evidentiary Errors

This court has adhered to the following standard to determine whether a trial court has erred in admitting evidence:

As a general rule, this court reviews evidentiary rulings for abuse of discretion. *Kealoha v. County of Hawai'i,* 74 Haw. 308, 319, 844 P.2d 670, 676 (1993). However, when there can only be one correct answer to the admissibility question, or when reviewing questions of relevance under HRE Rules 401 and 402, this court applies the right/wrong standard of review. *Id.* at 319, 844 P.2d at 676; *State v. White,* 92 Hawai'i 192, 204–05, 990 P.2d 90, 102–03 (1999).

*Kamaka v. Goodsill Anderson Quinn & Stifel,* 117 Hawai'i 92, 104, 176 P.3d 91, 103 (2008).

## III. DISCUSSION

### A. The Circuit Court Erred By Granting Judgment As a Matter Of Law On the Rays' Negligent Treatment Claim.

KMS asserts that the circuit court erred in granting judgment as a matter of law to the Rays because: 1) "evidence existed from which the jury could have concluded that Alyssa's myopathy was not caused by Dr. Yamamoto's steroid treatment, but by Alyssa's pre-existing lupus or some other undetermined cause[;]" and 2) "the jury could have found that although *prescribing* a *four*-week steroid treatment was negligent, the *three*-week treatment actually *administered* was not." In response, the Rays assert that judgment as a matter of law was appropriate because: 1) the jury's verdict was not supported by substantial evidence; and 2) the jury's verdict was irreconcilable. We hold that the circuit court wrongly granted judgment as a matter of law in favor of the Rays on negligent treatment. Additionally, we hold that the jury's verdict is irreconcilable because the jury found that Dr. Yamamoto's treatment did not cause Alyssa's injuries in the negligence claim, but it also found that Dr. Yamamoto's failure to properly inform the Rays was a legal cause of Alyssa's injuries. The verdict is irreconcilable under the

facts of this case because, in both interrogatories, the jury was called upon to decide whether the second and third pulses of steroids caused Alyssa's injuries and gave different responses. Therefore, we remand this case for a new trial.

1. *There is substantial evidence supporting the jury's verdict of no causation.*

██ KMS asserts that there was substantial evidence supporting the jury's verdict of no causation. This court reviews the trial court's granting of a renewed motion for judgment as a matter of law *de novo*. *Miyamoto*, 104 Hawai'i at 6–7, 84 P.3d at 514–15. "A [motion for judgment as a matter of law] may be granted only when after disregarding conflicting evidence, giving to the non-moving party's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in the non-moving party's favor, it can be said that there is no evidence to support a jury verdict in his or her favor." *Id.* at 7, 84 P.3d at 515 (quoting *Tabieros*, 85 Hawai'i at 350, 944 P.2d at 1293). "[V]erdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings." *Richardson v. Sport Shinko (Waikiki Corp.)*, 76 Hawai'i 494, 502, 880 P.2d 169, 177 (1994) (internal quotation marks omitted) (quoting *Tsugawa v. Reinartz*, 56 Haw. 67, 71, 527 P.2d 1278, 1282 (1974)). Substantial evidence is "credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion." *Id.* (internal quotation marks omitted) (quoting *In re Doe, Born on January 5, 1976*, 76 Hawai'i 85, 93, 869 P.2d 1304, 1312 (1994)). Thus, the dispositive question on appeal is whether substantial evidence supports KMS' assertion that Dr. Yamamoto's treatment did not cause Alyssa's injuries. The Rays bore the burden of proving that Alyssa's injuries resulted from Dr. Yamamoto's treatment. *Miyamoto*, 104 Hawai'i at 15, 84 P.3d at 523 ("It is well-settled that, in any negligence

action, the plaintiff—not the defendant—has the burden of proving the requisite elements, including legal causation.").

Substantial evidence supported the jury's verdict. For instance, Dr. Futatsugi's deposition testimony was admitted into evidence, and he testified that he could not confirm whether the steroids administered by Dr. Yamamoto caused Alyssa's weakness.[3] Dr. Yamamoto testified that shortly after her appointment with Dr. Futatsugi, she could not confirm whether her steroids caused Alyssa's weakness. Although Dr. Yamamoto testified that she concluded that Alyssa's weakness was due to the steroids she administered, and that steroids were the "highest level of suspicion" for Alyssa's weakness, she also testified that at various points she could not confirm the cause of Alyssa's muscle weakness. Dr. Pascual and Dr. Punaro testified that they employed a similar treatment to the one performed by Dr. Yamamoto and it had not caused permanent steroid myopathy. Although they testified that they were not opining as to whether Alyssa suffered from steroid myopathy, their testimony is some evidence that Alyssa's injuries were not caused by Dr. Yamamoto's treatment. Other witnesses also testified that they had not heard of permanent muscle weakness as a result of steroid myopathy and that it had not been reported in medical literature. The evidence adduced by KMS may not be convincing, but a reasonable juror could have inferred that the steroids that Dr. Yamamoto administered did not cause Alyssa's injuries.

██ Furthermore, the Rays had the burden of proving that Alyssa's injuries were caused by Dr. Yamamoto's negligent treatment. *Id.* Although the Rays produced testimony from Dr. Danon that Dr. Yamamoto's treatment caused Alyssa's injuries, expert "testimony is not conclusive and like any testimony, the jury may accept or reject it." *Bachran v. Morishige*, 52 Haw. 61, 67, 469 P.2d 808, 812 (1970). The jury was also instructed that the plaintiffs were required to prove causation by expert testimony, and

**3.** The Rays assert that Dr. Futatsugi eventually came to the conclusion that steroids caused Alyssa's muscle weakness. The Rays cite to Dr. Yamamoto's summary of her discussions with

Dr. Futatsugi to support this conclusion. This argument is not persuasive because Dr. Futatsugi testified that he was unsure of whether steroids caused Alyssa's muscle weakness.

that they could reject expert testimony in whole or in part. In light of the evidence noted above, the jury reasonably could have chosen not to believe Dr. Danon and the plaintiffs' witnesses.[4] Thus, we reverse the circuit court's grant of judgment as a matter of law because KMS produced substantial evidence such that a reasonable juror could have concluded that Alyssa's injuries were not caused by Dr. Yamamoto's treatment.

2. *The verdict is irreconcilable, and we therefore remand the case for a new trial.*

■ The circuit court also granted judgment as a matter of law because it determined that the jury's verdict was irreconcilable. KMS asserts that the trial court erroneously granted judgment as a matter of law because: 1) the verdict was not irreconcilable; and 2) even if it was, the proper remedy was a new trial. In response, the Rays assert that the circuit court did not err in granting judgment as a matter of law because the verdict was irreconcilably inconsistent. We hold that: 1) the verdict is irreconcilable because the jury found that Dr. Yamamoto's treatment did not cause Alyssa's injuries, but reached the opposite conclusion on informed consent; and 2) the proper remedy is to remand for a new trial.

KMS asserts that the verdict is not inconsistent because "the jury may have concluded that the steroid treatment caused the injury, but that the particular aspect of Dr. Yamamoto's treatment that was negligent (her decision to prescribe steroids for four weeks rather than three) was not the legal cause of that injury because the pulses were discontinued after the third week." In response,

the Rays assert that: 1) KMS waived this argument because it did not raise it before the trial court; 2) "the jury instructions given would not have supported a finding of negligence based on something Dr. Yamamoto planned but did not do[;]" and 3) the Rays "never argued, and the jury was never asked to consider, whether Dr. Yamamoto was negligent for planning to administer four pulses." [5]

■ "A conflict in the answers to questions in a special verdict does not automatically warrant a new trial; a new trial will be ordered only if the conflict is irreconcilable." *Dunbar v. Thompson*, 79 Hawai'i 306, 312, 901 P.2d 1285, 1291 (App.1995) (internal quotation marks omitted) (quoting *Kalilikane v. McCravey*, 69 Haw. 145, 152, 737 P.2d 862, 867 (1987)). "In determining whether an irreconcilable conflict exists between answers to special verdict questions, the answers 'are to be construed in the context of the surrounding circumstances and in connection with the pleadings, instructions, and issues submitted.'" *Id.* (quoting 9A C. Wright and A. Miller, *Federal Practice and Procedure* : Civil 2d § 2510, at 203 (1995)). "The theory, however, must be supported by the trial court's instructions to the jury." *Carr v. Strode*, 79 Hawai'i 475, 489, 904 P.2d 489, 503 (1995) (citing *Toner v. Lederle Laboratories*, 828 F.2d 510, 512 (9th Cir.1987)).

■ First, KMS asserts that the verdict is not irreconcilable because the jury was analyzing distinct causation issues. This argument is not persuasive because both negligent treatment and informed consent require a finding that the treatment was a substantial factor in bringing about the plaintiff's injuries. *Barcai v. Betwee*, 98 Hawai'i 470, 483, 50 P.3d 946, 959 (2002) (holding that a

---

4. The Rays also assert that KMS failed to produce expert testimony about an alternative cause for Alyssa's weakness. The Rays cite to cases holding that defendants attempting to prove an alternative cause of the plaintiff's injury must adduce expert testimony. *See Stinson v. England*, 69 Ohio St.3d 451, 633 N.E.2d 532, 538 (1994) (holding that a defendant seeking to prove an alternative cause of the plaintiff's injury must "adduce expert testimony of its probable nature"); *Smith v. German*, 434 Pa. 47, 253 A.2d 107, 109 (1969). The Rays' argument misses the point because KMS did not attempt to specifical-

ly attribute Alyssa's injury to an alternative cause. Instead, KMS raised doubt about whether Dr. Yamamoto's treatment caused Alyssa's injuries.

5. The Rays raise these arguments when asserting that the jury's finding of negligence was based on Dr. Yamamoto's failure to reassess the need for steroids after she administered the first pulse. We address these arguments in the context of whether the jury's verdict is irreconcilable because they are also relevant to that analysis.

plaintiff in an informed consent action must prove that "the physician's treatment was a substantial factor in bringing about the patient's injury"). At trial, the Rays asserted that Dr. Yamamoto negligently treated Alyssa by providing the second and third pulses. The negligent treatment and informed consent verdicts are irreconcilable because the jury found that Dr. Yamamoto's treatment did not cause Alyssa's injuries, but reached the opposite conclusion on informed consent.

▆▆▆ KMS now asserts that the verdict is not irreconcilable because Dr. Yamamoto's prescription of the fourth pulse could have constituted her negligent treatment, and the fourth pulse did not cause Alyssa's injuries. KMS waived this argument. KMS asserts that in "the trial court, [it] argued that if prescribing the four weeks was negligent, 'that negligence could not have been a legal cause of Alyssa's injuries' and '[t]his fact could explain the jury's no-causation finding.'" However, KMS made this argument in its reply brief in its motion for judgment as a matter of law on the grounds that Dr. Yamamoto's treatment was not negligent as a matter of law. KMS never argued its interpretation of the jury's verdict when challenging the circuit court's grant of judgment as a matter of law in favor of the Rays on the issue of causation. KMS' argument, which was made in a different context, did not alert the circuit court that it was asserting that the circuit court erred by granting judgment as a matter of law based on its newfound interpretation of the jury's verdict. See Kawamata Farms, Inc. v. United Agri Products, 86 Hawaiʻi 214, 248, 948 P.2d 1055, 1089 (1997) ("It is unfair to the trial court to reverse on a ground that no one even suggested might be error.") (quoting Ellis v. State, 36 Ark. App. 219, 821 S.W.2d 56, 57 (1991)); see also Child Support Enforcement Agency v. Doe, 109 Hawaiʻi 240, 246, 125 P.3d 461, 467 (2005); Scallen v. Comm'r of Internal Revenue, 877 F.2d 1364, 1375 (8th Cir. 1989) (describing the purpose of the waiver rule as "to enforce the policy that requires litigants to inform the trial court promptly of any possible errors that it may have made so that it may have an opportunity to correct them."). Therefore, the jury's verdict is irreconcilable, because KMS waived the theory under which it attempts to reconcile the jury's verdict.

▆▆▆ Second, KMS asserts that the proper remedy for an irreconcilable verdict is to grant a new trial. This argument is persuasive because a new trial is generally the remedy for an irreconcilable verdict. See Carr, 79 Hawaiʻi at 489, 904 P.2d at 503 ("A conflict in the jury's answers to questions in a special verdict will warrant a new trial only if those answers are irreconcilably inconsistent, and the verdict will not be disturbed if the answers can be reconciled under any theory.") (emphasis added); Charles A. Wright & Authur R. Miller, Federal Practice and Procedure § 2510 at 166–71 (2008) ("If the jury's answers are inconsistent with each other even when the presiding judge views them in the most generous way to avoid such a conclusion, a new trial under Rule 59(a) ordinarily is the proper pathway for the trial judge to follow and may be the required course, as numerous federal district courts and courts of appeal have concluded.").

The Rays assert that judgment as a matter of law is the proper remedy because the jury's finding of no causation was not supported by substantial evidence. As discussed above, this argument is not persuasive because the jury's no causation finding was supported by substantial evidence.

▆▆▆ Finally, the Rays assert that KMS waived its objection to the inconsistency in the jury's verdict by failing to object before the jury was excused. (Citing Kosmynka v. Polaris Indus., Inc., 462 F.3d 74, 83 (2d Cir.2006) ("It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury.")) The Rays rely on cases holding that an objecting party cannot raise the irreconcilability of the verdict as a ground for a new trial after the jury has been dismissed. Coralluzzo v. Education Mgmt. Corp., 86 F.3d 185, 186 (11th Cir.1996) ("To allow a new trial after the objecting party failed to seek a proper remedy at the only time possible [i.e., before the jury is discharged] would undermine the incentives for efficient trial procedure and

would allow the possible misuse of Rule 49 procedures ... by parties anxious to implant a ground for appeal should the jury's opinion prove distasteful to them.") (quoting *Skillin v. Kimball*, 643 F.2d 19, 20 (1st Cir.1981)). This argument is not persuasive because the circuit court raised the irreconcilability of the verdict *sua sponte* and granted judgment as a matter of law in favor of the Rays on that ground. KMS did not have a duty to argue for a new trial based on the irreconcilability of the jury's verdict before the jury was dismissed because it was not seeking a new trial on that ground and the circuit court raised the issue *sua sponte*. Therefore, we hold that the circuit court erred by granting judgment as a matter of law in favor of the Rays, and remand the case for a new trial because the jury's verdict is irreconcilable.

**B. The Circuit Court Did Not Err By Denying KMS' Motion For Judgment As a Matter Of Law On Informed Consent.**

During and after trial, KMS moved for judgment as a matter of law on the Rays' informed consent claim asserting Hawai'i case law requires a plaintiff in an informed consent case to show that he or she was not informed of a risk of injury that in fact occurred. Because the Rays admitted that Alyssa was informed of steroid myopathy, KMS asserted that it was entitled to judgment as a matter of law. The trial court denied these motions, and concluded that "there may very well be a disconnection legal [sic] and analytically between what the cases have told us so far about this, the elements are, and what the statute provides for." The circuit court denied the motions because HRS § 671–3 (Supp.2009) requires the physician to inform patients of recognized alternatives.

On appeal, KMS asserts that it is entitled to judgment as a matter of law on the Rays' informed consent claim because: 1) Dr. Yamamoto disclosed the possibility of the injury that Alyssa suffered; and 2) Dr. Yamamoto's decision not to inform the Rays of a different dosage of the same medication is not a "recognized alternative treatment or procedure" under HRS § 671–3(b)(4). In re-

sponse, the Rays assert that: 1) a plaintiff can maintain an informed consent action for failure to disclose an alternative treatment even if the physician disclosed the risk of the injury that actually occurred; 2) KMS waived its argument that a different dose was not an alternative treatment; and 3) the administration of fewer pulses of steroids was an alternative treatment. KMS' arguments are not persuasive and we therefore affirm the circuit court's denial of its motions for judgment as a matter of law.

1. *Hawai'i courts have not explicitly required plaintiffs claiming the failure to disclose an alternative treatment to prove that they were injured by a risk that was not disclosed to them.*

KMS correctly notes that Dr. Yamamoto informed the Rays of the risk of steroid myopathy, and that the Rays claimed that Alyssa eventually suffered from steroid myopathy. KMS asserts that the following language from Hawai'i cases requires granting KMS judgment as a matter of law:

*Claims for negligent failure to obtain informed consent typically arise when a plaintiff patient alleges that the defendant physician failed to warn the patient of a particular risk associated with the procedure and the particular risk ultimately occurred. To establish a claim of negligent failure to obtain informed consent under Hawai'i law, the plaintiff must demonstrate that: (1) the physician owed a duty to disclose the risk of one or more of the collateral injuries that the patient suffered; (2) the physician breached that duty ; (3) the patient suffered injury; (4) the physician's breach of duty was a cause of the patient's injury in that (a) the physician's treatment was a substantial factor in bringing about the patient's injury and (b) a reasonable person in the plaintiff patient's position would not have consented to the treatment that led to the injuries had the plaintiff patient been properly informed; and (5) no other cause is a superseding cause of the patient's injury.*

*Barcai v. Betwee*, 98 Hawai'i 470, 483–84, 50 P.3d 946, 959–60 (2002) (emphasis added)

(citing *Bernard v. Char*, 79 Hawai'i 362, 365, 371, 903 P.2d 667, 670, 676 (1995)).

HRS § 671–3(b) requires physicians to inform patients of the "recognized alternative treatments or procedures, including the option of not providing these treatments or procedures[,]" the "recognized material risks of serious complications or mortality associated with" those procedures, and the "recognized benefits of the recognized alternative treatments or procedures." HRS § 671–3(b)(4)–(6). Hawai'i courts have also concluded that an element of informed consent is providing information about "recognized possible alternative forms of treatment." *Barcai*, 98 Hawai'i at 483, 50 P.3d at 959 (citing HRS § 671–3); *Keomaka v. Zakaib*, 8 Haw. App. 518, 524, 811 P.2d 478, 482–83 (App. 1991) (stating that a physician is required to inform the patient of the items in HRS § 671–3(b)).

As the circuit court observed, although the general language in Hawai'i case law supports KMS' argument, KMS has not shown that Hawai'i courts have directly held that plaintiffs claiming the failure to disclose an alternative treatment are required to show that they suffered an injury that the physician failed to disclose. For instance, in *Barcai*, this court observed that claims "for negligent failure to obtain informed consent *typically arise* when a plaintiff patient alleges that the defendant physician failed to warn the patient of a particular risk associated with the procedure and the particular risk ultimately occurred." *Barcai*, 98 Hawai'i at 483, 50 P.3d at 959 (emphasis added).

KMS asserts that *Keomaka v. Zakaib* is a case involving the failure to disclose an alternative treatment where the ICA held that plaintiffs are required to prove that they suffered an injury not disclosed to them. 8 Haw.App. at 524–25, 811 P.2d at 483. This argument is not persuasive because *Keomaka* did not directly confront the issue of whether a plaintiff claiming a failure to properly inform of alternative treatments must also prove that she "would not have undergone the treatment had he known of the risk of harm that in fact occurred." *See id.* at 527, 811 P.2d at 484. Although the court

cited that rule, it did not hold that a different causation standard does not apply to alternative treatment claims. Thus, Hawai'i courts have not required plaintiffs claiming the failure to disclose an alternative treatment to prove that they were injured by a risk that was not disclosed to them.

KMS' interpretation of Hawaii's informed consent law is incorrect for three reasons. First, this court has interpreted HRS § 671–3(b) as supplying the standard for a physician's duty to disclose information to the patient. *Barcai*, 98 Hawai'i at 483, 50 P.3d at 959 (noting that the elements of informed consent commonly consist of informing the patient about recognized possible alternative forms of treatment, including non-treatment); *Keomaka*, 8 Haw.App. at 524, 811 P.2d at 483; *Ditto v. McCurdy*, 86 Hawai'i 84, 90, 947 P.2d 952, 958 (1997) ("It is well established that the doctrine of informed consent imposes an affirmative duty upon physicians or surgeons to fully disclose to a patient 'the types of risks and alternatives' to a proposed treatment or surgery."). Because this court has interpreted HRS § 671–3(b) as requiring a physician to disclose an alternative treatment to a patient, requiring a plaintiff to prove that she suffered an injury that the physician failed to disclose conflicts with Hawaii's informed consent statute.

Second, other courts have held that an informed consent action for failure to properly inform of alternative treatments requires a plaintiff to "show causation by establishing that a 'prudent person in the patient's position would have decided differently if adequately informed.'" *Caputa v. Antiles*, 296 N.J.Super. 123, 686 A.2d 356, 363 (N.J.Super.Ct.App.Div.1996) (internal quotation marks omitted) (quoting *Largey v. Rothman*, 110 N.J. 204, 540 A.2d 504, 510 (1988)). This standard more fully comports with Hawaii's case law because it allows a plaintiff to prove that the physician's failure to inform of an alternative treatment caused the injury.

Third, KMS asserts that the legislative history of HRS § 671–3(b) indicates that the purpose of enacting the statute was to lessen physicians' liability and decrease medical malpractice insurance premiums. (Citing *Keomaka*, 8 Haw.App. at 528, 811 P.2d at

484–85.) The general purpose of HRS § 671–3 does not override this court's interpretation of that statute as supplying the standard for informed consent. Furthermore, the report KMS refers to in *Keomaka* states that even "if the patient actually does consent to the particular procedure or operation, *liability may be predicted on the basis that he was not made fully aware of the risks involved or the alternatives available.*" Hse. Stand. Comm. Rep. No. 417–76, in 1976 House Journal, at 1459 (emphasis added). This language undermines KMS' interpretation by indicating that the failure to disclose an alternative treatment gives rise to a cause of action for failure to provide informed consent.

■ KMS also asserts that the legislature failed to respond to this court's interpretation of HRS § 671–3. It observes that when "the legislature fails to act in response to our statutory interpretation, the consequence is that the statutory interpretation of the court must be considered to have the tacit approval of the legislature and the effect of legislation." *State v. Dannenberg*, 74 Haw. 75, 83, 837 P.2d 776, 780 (1992), *superceded by statute on other grounds as stated in, State v. Klie*, 116 Hawai'i 519, 174 P.3d 358 (2007). This argument is not persuasive because this court has never established the interpretation of HRS § 671–3 urged by KMS. Therefore, the circuit court did not err by denying KMS' motion for judgment as a matter of law on the Rays' informed consent claim.

2. *An alternative dosage of the same medication can be a "recognized alternative treatment" under HRS § 671–3(b)(4).*

KMS asserts that "a different *dose* option for the *same medication* that was actually administered is not an alternative treatment or procedure that must be disclosed to a patient under HRS section 671–3(b)(4)." In response, the Rays assert that: 1) KMS waived this argument; and 2) administering

6. The Rays also assert that KMS invited the error. It is unnecessary to reach this issue in

fewer pulses to treat lupus was an alternative treatment.[6] We agree with the Rays.

■ First, the Rays assert that KMS waived this argument because it was not raised in any of its three motions for judgment as a matter of law. KMS responds that it raised this argument in its reply brief in support of its renewed motion for judgment as a matter of law. Because KMS did not raise this argument until its reply brief, it has waived it. *See Abrams v. Ciba Specialty Chemicals Corp.*, 663 F.Supp.2d 1220, 1232 n. 16 (S.D.Ala.2009) ("[N]ew arguments are impermissible in reply briefs.").

■ Second, even assuming KMS properly preserved this argument, alternative doses of the same medication can constitute "recognized alternative treatments." Whether a different dose of the same medication can constitute an alternative treatment is an issue of first impression in this jurisdiction. Hawai'i courts have adopted the patient-oriented standard for determining whether particular information must be disclosed to a patient. This court has held that the "dispositive inquiry regarding the physician's duty to disclose in an informed consent case, therefore, is not what the physician believes his or her patient needs to hear in order for the patient to make an informed and intelligent decision; the focus should be on what a reasonable person objectively needs to hear from his or her physician to allow the patient to make an informed and intelligent decision regarding proposed medical treatment." *Carr v. Strode*, 79 Hawai'i 475, 485–86, 904 P.2d 489, 499–500 (1995).

■ Under the foregoing standard, an alternative dosage can constitute a "recognized alternative treatment" within the meaning of HRS § 671–3(b)(4). If a reasonable patient would need to hear the information to make an informed decision, the physician is required to disclose that information. In the instant case, the plaintiffs adduced evidence that recognized alternative dosing regimens had a lower risk of steroid myopathy. Thus, the Rays adduced evidence that a

light of our conclusion that KMS has waived it.

reasonable person would need to hear about the different recognized pulsing methods to make an informed decision.

KMS asserts that "requiring a physician to disclose such information would not only dramatically expand the physician's liability (because a patient could always claim, in hindsight, that the physician should have disclosed the option of receiving a lower dose), it would likely overwhelm the patient and interfere with the patient's ability to make an informed and intelligent decision about his or her healthcare." KMS' concerns are overstated. Section 671-3(b)(4) requires a physician to inform a patient of *"recognized alternative treatments or procedures."* (Emphasis added.) This court has held that "expert testimony will ordinarily be required to establish the 'materiality' of the risks, *i.e.,* 'the nature of risks inherent in a particular treatment, the probabilities of therapeutic success, the frequency of the occurrence of particular risks, and the nature of available alternatives to treatment.'" *Barcai,* 98 Hawai'i at 484, 50 P.3d at 960 (quoting *Carr,* 79 Hawai'i at 486, 904 P.2d at 500). Thus, healthcare providers will not be overwhelmed by our holding because the plaintiff will need to show that the medical community recognizes the different dosage as an alternative treatment. Therefore, we hold that the circuit court properly denied KMS' motion for judgment as a matter of law.

## C. The Circuit Court Erred By Admitting Dr. Bernstein's Testimony and the Error Was Not Cured By the Circuit Court's Instructions To the Jury.

■ KMS asserts that the circuit court erroneously allowed the plaintiffs' standard of care expert, Dr. Bernstein, to testify that Dr. Yamamoto owed a duty to disclose her and the medical community's experience with the treatment, and that she failed to meet that obligation.[7] We hold that the circuit court erred by admitting Dr. Bernstein's tes-

timony regarding Dr. Yamamoto's experience with the treatment,[8] and that its error was not cured by its instructions to the jury.

■ At the time the Rays consented to treatment, Hawaii's informed consent statute did not explicitly require a physician to disclose her or the medical community's experience with a treatment option. *See* HRS § 671-3 (1993). "The elements of informed consent commonly consist of ensuring that the patient consents to the prescribed procedure only after being made aware of the: (1) condition being treated; (2) *nature and character of the proposed treatment or surgical procedure;* (3) anticipated results; (4) recognized possible alternative forms of treatment; and (5) recognized serious possible risks, complications, and anticipated benefits involved in the treatment or surgical procedure, as well as the recognized possible alternative forms of treatment, including nontreatment." *Barcai,* 98 Hawai'i at 483, 50 P.3d at 959 (emphasis added) (citing HRS § 671-3). After *Barcai,* the legislature amended HRS § 671-3 by deleting the requirement that a physician disclose the "nature and character" of the proposed treatment, and replacing it with a requirement to provide a "description of the proposed treatment or procedure." HRS § 671-3 (Supp. 2010).

■ The Rays assert that the circuit court did not err by admitting Dr. Bernstein's testimony, because at the time they consented to the treatment, HRS § 671-3 required a physician to disclose the "nature and character" of the treatment. They assert that the physician's experience falls within the nature and character of the treatment. This argument is not persuasive because, even assuming that the prior version of HRS § 671-3 applies, the Rays point to no authority interpreting the "nature and character" language as inclusive of a physician's experience with a particular treatment. Ad-

---

7. KMS also asserts that the circuit court erred by admitting Dr. Danon's testimony that Dr. Yamamoto's failure to properly inform the Rays caused Alyssa's injuries. Because we hold that the trial court erred by admitting Dr. Bernstein's testimony, it is unnecessary to address KMS' argument regarding Dr. Danon's testimony.

8. In light of this conclusion, it is unnecessary to address the medical community's experience with the treatment.

ditionally, the plain language of HRS § 671–3 indicates that this interpretation is untenable. The term "character" is not defined by HRS § 671–3, however, this court "may resort to legal or other well accepted dictionaries as one way to determine the ordinary meaning of certain terms not statutorily defined." *Nuuanu Valley Ass'n v. City and County of Honolulu,* 119 Hawai'i 90, 98, 194 P.3d 531, 539 (2008) (internal quotation marks omitted) (quoting *Leslie v. Bd. of Appeals of the County of Hawai'i,* 109 Hawai'i 384, 393, 126 P.3d 1071, 1080 (2006)). Character, in this context, is defined as "the aggregate of features and traits that form the individual nature of some person or thing." *Webster's Unabridged Dictionary* 346 (2d ed. 2001). Similarly, nature means "having the character or qualities of" a thing. *Id.* at 1281. Dr. Yamamoto's experience with pulse therapy is not a distinguishing feature or attribute of steroid pulse therapy. Therefore, the plain language of HRS § 671–3 rejects the Rays' interpretation of the term "nature and character" and Dr. Bernstein's testimony that a physician should disclose her experience with a treatment to properly obtain informed consent was contrary to Hawai'i law.

 The circuit court's error in admitting Dr. Bernstein's testimony was not cured by its instructions to the jury. "When a court has admonished a jury to disregard an improper statement, the ordinary presumption is that the jury will do so." *Chung v. Kaonohi Center Co.,* 62 Haw. 594, 599, 618 P.2d 283, 287 (1980), *abrogated on other grounds by, Francis v. Lee Enterprises, Inc.,* 89 Hawai'i 234, 244, 971 P.2d 707, 717 (1999). However, "this court has held that when improper testimony is prejudicial to the opposing party, the ordinary presumption prevails 'only if there is a reasonable certainty that the impression upon the jury could be or was dispelled by the court's admonition.'" *Id.* (quoting *Young v. Price,* 48 Haw. 22, 27, 395 P.2d 365, 368 (1964)). In the instant case, Dr. Bernstein's testimony was referred to numerous times by multiple witnesses. For instance, Michael and Debbie Ray testified that they would not have consented to the treatment had they known Dr. Yamamoto's inexperience with it. Additionally, the curative instruction came nearly a month after the admission of Dr. Bernstein's testimony. Under these circumstances, the presumption does not apply because there was not a reasonable certainty that the impression could be or was dispelled by the court's admonition. *See id.* at 599–600, 618 P.2d at 288 (holding that the admission of testimony was cured by the trial court's instruction where "there was not a series of improper statements throughout the trial, nor was the improper testimony allowed to stand, thereby permitting emotional and irrelevant testimony to influence the jury").

The Rays also assert that the cautionary instruction issued when Dr. Bernstein testified indicates that the jury "did not absorb [his] testimony uncritically." This argument is unpersuasive because the cautionary instruction did not tell the jury that Dr. Bernstein's testimony was inadmissible. Furthermore, the circuit court allowed multiple witnesses to refer to that testimony before issuing a curative instruction more than three weeks after the inadmissible testimony. Because the cautionary instruction was incomplete, it did not cure the circuit court's error. Therefore, we reverse the circuit court's judgment because Dr. Bernstein's inadmissible testimony about Dr. Yamamoto's experience with steroid pulse therapy was not cured by the circuit court's instructions to the jury.

## IV. CONCLUSION

For the foregoing reasons, we vacate the circuit court's judgment and remand for a new trial.