Electronically Filed
Supreme Court
SCWC-14-0001305
23-APR-2019
10:28 AM

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

ELESTHER CALIPJO,
Petitioner/Plaintiff-Appellee,

vs.

JACK PURDY, REGAL CAPITAL CORPORATION,
REGAL CAPITAL COMPANY, LLC,
Respondents/Defendants-Appellants.

_____

SCWC-14-0001305

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-14-0001305; CIVIL NO. 04-1-0003)

APRIL 23, 2019

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY WILSON, J.

## I. INTRODUCTION

We consider only one issue from the application for writ of certiorari filed by Petitioner Elesther Calipjo ("Calipjo"): whether there was no evidence to support the jury's verdict that (1) Respondent Jack Purdy ("Purdy") was the alter ego of Respondents Regal Capital Corporation ("Regal Corp.") and Regal Capital Company, LLC ("Regal LLC") (collectively, "Respondents"), (2) Regal Corp. breached the

contracts it entered into with Calipjo, and (3) Regal LLC committed unfair and deceptive acts or practices.

In a jury trial before the Circuit Court of the Fifth Circuit[1] ("circuit court"), the jury found that Regal Corp. violated the agreements of sale for two parcels of land on the island of Kaua'i and breached the covenant of good faith and fair dealing implied in the agreements. The jury determined that Regal Corp. and Regal LLC committed unfair and deceptive acts or practices in their dealings with Calipjo. Furthermore, the jury concluded that Purdy was the alter ego of Regal Corp. and Regal LLC. Based on the alter ego finding, the jury determined that Purdy, too, violated the agreements of sale for the two properties, breached the covenant of good faith and fair dealing implied in the agreements, and committed unfair and deceptive acts or practices.

We hold that there was evidence to support the jury's verdict that Regal Corp. violated the terms of the agreements, Regal LLC engaged in unfair and deceptive acts or practices, and Purdy was the alter ego of Regal Corp. and Regal LLC. Therefore, the Intermediate Court of Appeals ("ICA") erred when it found that no evidence was introduced at trial to support these findings. Calipjo v. Purdy, No. CAAP-14-0001305, 2017 WL

---

[1] The Honorable Randal Valenciano presided over the trial.

6547461, at *4-*7 (App. Dec. 22, 2017) (SDO).  Additionally, the ICA erred when it reversed the circuit court's final judgment against Purdy on the breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair and deceptive acts or practices claims.[2]  We affirm in part and vacate in part the ICA's January 24, 2018 Judgment on Appeal and reinstate the circuit court's July 18, 2014 final judgment.

## II.  BACKGROUND

On or around August 12, 2002, Calipjo entered into two Deposit Receipt Offer and Acceptance ("DROA") contracts with Regal Corp. for the purchase of two lots owned by Regal Corp. on the island of Kaua'i:  Unit E of the Moana Ranch Estates ("Moana property") and Unit A of the Ali'i Ranch Estates ("Ali'i property").  At the time, Purdy was the sole owner and operator of Regal Corp.  The DROAs governed the sale of the Moana property for $175,000.00 and the Ali'i property for $280,000.00.

The Moana and Ali'i property DROAs contained different "special terms" located in condition C-67 of each contract.  On the one hand, condition C-67 of the Moana property DROA provided that Calipjo's purchase of the Moana property was contingent on

---

[2]     The ICA reversed the judgment against Purdy for breach of contract (Counts 3 and 4), breach of the covenant of good faith and fair dealing (Count 11), and unfair and deceptive acts or practices (Count 10).  Calipjo, 2017 WL 6547461, at *7.

3

his purchase of the Ali'i property.[3]  On the other hand,

condition C-67[4] of the Ali'i property DROA gave Calipjo an option

to purchase the Ali'i property once the Real Estate Commission of

the Department of Commerce and Consumer Affairs of the State of

Hawai'i ("Commission") issued a Final Condominium Public Report

for the properties.[5]  Condition C-67 of the Ali'i property DROA

also gave Calipjo the option to terminate the Ali'i property DROA

by giving written notice to Regal Corp. at any time prior to the

issuance of the Final Condominium Public Report.[6]  When Calipjo

---

[3]     Condition C-67 of the Moana property DROA provided that the purchase of the Moana property was "[c]ontingent upon Buyer's purchase and successful close of escrow for Unit A of Alii Ranch Estates I[.]"

[4]     Condition C-67 of the Ali'i property DROA stated:

> 1) This DROA shall constitute a reservation and not an obligation to purchase or sell subject property.  Buyer may terminate this reservation at any time prior to it becoming a binding contract by written notice to Seller. 2) Seller to provide to Buyer a copy of the Final Public Report upon completion of [Condominium Property Regime ("CPR")].  Buyer shall have 15 days to examine said Report and rescind this reservation by written notice to Seller. At expiration of stated examination period this DROA shall become a binding contract.  3) All contingency dates stated in this DROA shall be based on the date that this offer becomes a binding contract.  4) This offer is contingent upon Seller's acceptance of Buyer's offer to purchase TMK 4-4-2-22-30-A.

[5]     Under the version of the Condominium Property Act effective at the time that Calipjo entered into the DROAs, the owner of a parcel that currently has condominiums or is zoned to have condominiums must notify the Commission of its intent to sell the property and submit a Final Condominium Public Report disclosing all material facts regarding the development. Hawai'i Revised Statutes ("HRS") §§ 514A-31, -36 (Supp. 2002).

[6]     The Ali'i property DROA provided, in pertinent part, "Buyer may terminate this reservation at any time prior to it becoming a binding contract by written notice to Seller."

signed the DROAs, Regal Corp. did not possess an option to terminate the Aliʻi property DROA.

Shortly thereafter, Regal Corp.'s real estate agent, Tom Summers ("Summers"), provided copies of the Aliʻi and Moana property DROAs to Purdy for review. At trial, Purdy testified that he thought it was unfair that condition C-67 in the Aliʻi property DROA only gave Calipjo, the buyer, the option to terminate the agreement. He testified that "[i]f the buyer had a right to terminate, then I should have that same right." Purdy instructed Summers to add the phrase "or Seller" to condition C-67 of the Aliʻi property DROA.[7] Thereafter, condition C-67 read: "This DROA shall constitute a reservation, and not an obligation to purchase or sell subject property. Buyer or Seller may terminate this reservation at any time prior to it becoming a binding contract by written notice to Seller." (Emphasis added.) Because the purchase of the Moana property was contingent on the purchase of the Aliʻi property, this addendum effectively gave the buyer or the seller the authority to terminate both DROAs at will—although the seller was not required to notify the buyer of its intent to cancel.

---

[7] Summers and Purdy dispute who handwrote "or Seller" above condition C-67. Summers claims that Purdy wrote the term in, while Purdy claims that his office merely directed Summers to add the term.

Summers informed Calipjo that he needed to come to Summers' office to initial and backdate the addendum to the Ali'i property DROA that added the language in condition C-67 giving the seller the authority to terminate the DROAs for the Ali'i and Moana properties without notice to the buyer.[8] While at Summers' office, Calipjo asked Summers if the alteration would change his position because he was unsure whether "or Seller" referred to himself or Regal Corp.[9] According to Calipjo, Summers replied, "No. I just — this is just a mere technicality with the CPR laws that they're doing." Summers later testified that he told Calipjo that the addition of "or Seller" was Purdy's counteroffer "and if [Calipjo] didn't want to acknowledge this, then he wouldn't have a reservation agreement." Relying on Summers' representations about the alteration, and with no prior experience with CPRs,[10] Calipjo initialed the addendum to the Ali'i property DROA and backdated his signature to August 12, 2002 per Summers' request. Neither Summers nor Calipjo

---

[8] Calipjo and Summers dispute the exact date upon which Calipjo returned to sign and backdate the addendum. Calipjo asserts that he signed the addendum the day after he originally signed the DROAs, on August 13, 2002. Summers claims that Calipjo returned on September 4, 2002 to sign and backdate the addendum.

[9] Calipjo asked, "Will this change my position because you are the seller or buyer?"

[10] Under the Condominium Property Act, a CPR governs ownership of condominiums or "single units, with common elements, located on property within the [CPR]." HRS § 514A-3 (1993).

testified that Calipjo received consideration for agreeing to the addendum. Upon signing and backdating the alteration, Calipjo deposited $5,000.00 per property into escrow, totaling $10,000.00.

Over the course of the next few months, while awaiting the Final Condominium Public Report, Calipjo met with several interested buyers for the Aliʻi and Moana properties. On October 30, 2002, Calipjo agreed to sell the Aliʻi property to a buyer for $375,000.00. The closing date was set for sixty days after Calipjo received the Final Condominium Public Report. Then, on April 14, 2003, Calipjo entered into a contract with Francis Green for the sale of the Moana property for $550,000.00.

Meanwhile, Purdy realized that the properties could be used for a lucrative high-end development. At trial he testified that after signing the DROAs, he gained "a learning and understanding of the property. And as time went on, it was sort of solidifying in [his] mind to do something better with the property." Statements made during his deposition further explained this realization:

> Our Realtor, Tom Summers[,] rehearsed the law. And the law was changing in terms of their ability to use an agricultural condominium for other than livestock and farming purposes. So we got the idea of putting rocks, gates at the entrance at each one of the lots, divided in the best few quarters to protect the few quarters of all lots, putting some common amenities on a common area on one of the lots, putting wood fences, plank fences, painted all the way around, making it really quite an exclusive property, which is far different than what we earlier started.

7

At the time, Purdy was not only the sole owner of Regal Corp., but also the sole member and manager of Regal LLC, a Hawai'i limited liability company. On April 30, 2003, approximately eight months after entering into the DROAs, Regal Corp. transferred its interest in the Ali'i property to Regal LLC. Likewise, on November 7, 2003, Regal Corp. assigned its interest in the Moana property to Regal LLC.

Regal Corp. was not paid for these properties. Purdy testified that although the properties were worth over 1.7 million dollars at the time of transfer, Regal LLC received them for free—no cash transfer or consideration was conveyed from Regal LLC to Regal Corp. At trial, Purdy referred to this transfer as a "book entry" and said that it was "pretty commonplace." He did not explain how Regal Corp. received value from the transfer.

On August 7, 2003, Calipjo received a letter from Purdy on behalf of Regal Corp. notifying Calipjo that Regal Corp. was exercising its right to cancel the Ali'i property DROA. Because the sale of the Moana property was contingent on the sale of the Ali'i property,[11] and Regal Corp. was no longer selling the Ali'i property, this letter effectively cancelled

_____

[11] Pursuant to condition C-67 of the Moana property DROA. See supra note 3, at 4.

8

both DROAs.  In the letter, Purdy explained that "[d]ue to the recent change in the law affecting the uses of agricultural property and the substantial increases in the real estate market over the past few months," Regal Corp. was exercising its right to cancel the Ali'i property DROA pursuant to condition C-67. Regal Corp. sent Calipjo notices of cancellation and refunded the $10,000.00 that Calipjo tendered into escrow.  Calipjo refused to execute the escrow cancellation forms and sent the checks back to escrow.

### A.    Circuit Court Proceedings

Calipjo brought suit against Respondents Regal Corp., Regal LLC, and Purdy seeking specific performance of the DROAs and money damages.  In his first amended complaint, Calipjo asserted, inter alia, two claims of breach of contract, one claim of breach of the covenant of good faith and fair dealing, and one claim for unfair and deceptive acts or practices.  He also claimed Purdy was the alter ego of Regal Corp. and Regal LLC.

### 1.    Calipjo's Arguments

In support of his breach of contract claims, Calipjo argued at trial that Regal Corp. violated the express terms of the DROAs by transferring the Ali'i property to Regal LLC before cancelling the DROAs.  He noted that, at the time the DROAs were originally entered into, Calipjo had an absolute right to

9

purchase the properties. This right was altered, he claimed, when Respondents required Calipjo to sign the addendum to condition C-67 of the Ali'i property DROA which gave Regal Corp. the option to terminate the DROA without notice to Calipjo at any time before issuance of the Final Condominium Public Report. Calipjo noted that Respondents altered condition C-67 of the Ali'i property DROA with the intent to cancel the DROAs after using Calipjo's offer to attract financing. Because Regal Corp. transferred the Ali'i property before cancelling the DROAs, Calipjo claimed, Regal Corp. breached the DROAs.

Next, Calipjo argued that Respondents committed unfair and deceptive acts or practices. He alleged that Regal Corp., Regal LLC, and Purdy carried out a fraudulent scheme to entice Calipjo into entering the DROAs, then cancel the DROAs once the development attracted greater financing.[12]

In addition, Calipjo argued that Purdy should be liable for the actions of Regal Corp. and Regal LLC as the alter ego of both companies. He raised three main issues to support his alter ego theory of liability. First, Calipjo identified Purdy as the sole shareholder, director, and officer of Regal Corp. and the sole member and manager of Regal LLC. Calipjo

---

[12] Calipjo testified that he saw a sign posted on the property grounds soliciting the sale of the Ali'i and Moana properties.

10

argued that sole ownership and control is one of many factors that can establish alter ego and, therefore, evidence of Purdy's ownership and control was pertinent to this claim.

Second, Calipjo claimed that Purdy used Regal Corp. and Regal LLC to perpetuate a fraud because he never intended to sell the properties, but rather, intended to develop the parcel himself and needed to attract financing for the project. According to Calipjo, Purdy's intent was to cancel the Ali'i property DROA after using it to obtain financing for Purdy's development of the property for his own benefit. To facilitate his eventual cancellation of the Ali'i property DROA, Purdy included in the contract the option permitting him, as the seller, to terminate the agreement.

Calipjo alleged that the Ali'i and Moana property DROAs helped Purdy successfully obtain financing for his intended development because the completed DROAs showed that Purdy had interested buyers:

> You know what he did with that contract? He showed it to people to get them more money. He's got contracts for preselling already. Banks love that stuff. He showed it to other people; oh, yeah, I got this property, it's got to be subdivided, I already got contracts already. It builds and it builds on itself because he's having trouble.

Calipjo contended that Purdy's intent to renege on the Ali'i property DROA became evident once he secured alternative financing because, at that time, Purdy cancelled the DROAs. Once the financing was secured for Purdy's intended development,

Purdy cancelled the Ali'i property DROA, which inherently cancelled the Moana property DROA, and thus perpetuated a fraud through Regal Corp. and Regal LLC. To support this claim, Calipjo testified that seven years after the parties entered into the DROAs, Purdy approached Calipjo outside the Kaua'i courthouse and said "[h]e [didn't] intend to sell [Calipjo] the property in the first place anyway." Although Purdy denied making this statement, another witness corroborated Calipjo's testimony.

Third, Calipjo raised an issue regarding undercapitalization. Based on Purdy's testimony, Calipjo contended that Purdy transferred approximately 1.2 million dollars[13] worth of real estate from Regal Corp. to Regal LLC "for nothing, zero." Calipjo alleged that because no money was paid to Regal Corp., this transfer left Regal Corp. severely undercapitalized. Therefore, he argued, Regal Corp. and Regal LLC failed to function as legitimate businesses and, instead, functioned as mere pretenses for Purdy's personal dealings. At the close of Calipjo's case, Respondents orally moved for

---

[13] There is no record of the value of the properties at the time of transfer and the parties disputed the value at trial. Calipjo claimed that the properties were worth 1.2 million dollars and Purdy claimed that the properties were worth 1.7 million dollars.

judgment as a matter of law on all claims. The motion was denied.

## 2. Respondents' Counter Arguments

Respondents argued to the jury that Calipjo failed to present sufficient evidence to support his claims. Respondents claimed that they did not breach the express terms of the DROAs or commit unfair and deceptive acts or practices because the DROAs were non-binding reservation agreements. Respondents claimed that Regal Corp. and Calipjo, acting as "sophisticated investor[s]," simply entered a rescindable agreement for the sale of two properties. They argued that condition C-67 of the Ali'i property DROA, as amended, granted the buyer and the seller the right to cancel the agreements at any time before the Final Condominium Public Report was issued. Because the purchase of the Moana property was contingent on the purchase of the Ali'i property, Respondents claimed, Regal Corp. lawfully exercised its right to cancel both DROAs.

In addition, Respondents asserted that there was insufficient evidence to support a finding of alter ego and emphasized that "[t]he only evidence [of alter ego] in this case is that [Purdy] owned both companies." Respondents stressed that exclusive ownership, alone, is not determinative of alter ego. Respondents denied Calipjo's claim that Purdy intended to cancel the DROAs from the start and only used the DROAs to

attract financing for his own personal gain. Purdy testified that the properties "weren't actively for sale" and he did not intend to sell the properties until Calipjo approached him and made an offer. Purdy also denied Calipjo's claim that Purdy approached him outside the courthouse and said that he never intended to sell Calipjo the properties.[14] Although Respondents did not specifically address the undercapitalization claim, Purdy testified that the transfer of the properties from Regal Corp. to Regal LLC for no cash or consideration was "pretty commonplace." At the close of their case, Respondents renewed their motion for judgment as a matter of law as to all claims. They argued that Purdy was not a party to the DROAs and there was "no evidence or testimony that would allow [the jury] to pierce the LLC veil or the corporate veil." Again, the circuit court denied the motion.

### 3. Jury Instructions

The circuit court provided the following jury instructions for the alter ego claim:

---

[14] On direct examination, Purdy testified as follows:

> [A.] By all means, I just put out my hand to say hi to him, because he happened to be facing me, and I wanted to see if I could see what was going on, you know, to open a conversation with these folks.
>
> Q. Did you ever tell him that you wouldn't have sold the property to him anyway?
>
> A. No.

Under the alter ego claim for relief, three elements must be established in order to award a piercing of the corporate veil. One, that the corporation was the mere instrumentality of the shareholder; two, that the shareholder exercised control over the corporation in such a way as to harm the plaintiff; and, three, that a refusal to disregard the corporate entity would subject the plaintiff to unjust loss.

. . . .

A corporation is, for most purposes, a legal entity distinct from its individual members or stockholders, who, as natural persons emerged into the corporate identity. However, the idea that a corporation is a legal entity existing separate and apart from the persons composing it is a mere fiction introduced for purposes of convenience and to serve the ends of justice. This fiction cannot be urged to an extent and purpose not within its reason and policy and, in an appropriate case, and in furtherance of the ends of justice, a corporation and the individual and individuals owning all its stock and assets may be treated as identical.

In this case, plaintiff dealt with the corporation known as Regal Capital Corporation and Antigua and Barbuda Corporation, one of the defendants in this case.

Plaintiff urges that this is an appropriate case in which the legal entity of Regal Capital Corporation should be disregarded and that plaintiff should be entitled to require payment of damages that Regal Capital Corporation owes plaintiff from defendant Jack Purdy.

You should consider the following facts in determining whether or not to disregard the legal entity of Regal Capital Corporation and return a verdict in favor of plaintiff against Defendant Jack Purdy, as an individual.

One, whether or not defendant Jack Purdy owned all or substantially all the stock in Regal Capital Corporation; two, whether or not Jack Purdy exercised discretion and control over the management of Defendant Regal Capital Corporation; three, whether or not Defendant Jack Purdy directly or indirectly furnished all or substantially all of the financial investment in Defendant Regal Capital Corporation; four, whether or not Regal Capital Corporation was adequately financed either originally or subsequently for the business in which it was to engage.

Five, whether or not there was actual participation in the affairs of Regal Capital Corporation by its stockholders and whether stock was issued to them. Six, whether or not Regal Capital Corporation observed the [formalities] of doing business as a corporation such as the holding of regular meetings, the issuance of stock, the filing of necessary reports and similar matters. Seven,

15

> whether or not Defendant Regal Capital Corporation [dealt] exclusively with Defendant Jack Purdy, directly or indirectly in the real estate sales development activities in this case. Eight, whether or not Defendant Regal Capital Corporation existed merely to do a part of business of Defendant Jack Purdy.
>
> If your determination of these facts or most of them, as well as the other evidence in this case leads you to believe that you should disregard the legal entity known as Defendant Regal Capital Corporation, then you will be justified in returning a verdict against Defendant Jack Purdy individually in such amount as you find due plaintiff from Defendant Regal Capital Corporation. On the other hand, if your consideration of these questions of fact or most of them, as well as the other evidence in this case, leads you to believe that Defendant Regal Corporation should be considered a legal entity distinct from its individual stockholders, then you will not return a verdict against Defendant Jack Purdy on this claim.[15]

The jury was instructed as follows on the breach of contract claim:

> A contract is an agreement between two or more persons which creates an obligation to do or not to do something. A contract may be written or oral. A contract requires proof of all of the following elements.
>
> One, persons with the capacity and authority to enter into the contract; and, two, an offer; and, three, an acceptance of that offer producing a mutual agreement or a meeting of the minds between the persons as to all of the essential terms of the agreement at the time the offer was accepted; and, four, consideration.
>
> An offer is an expression of willingness to enter into a contract which is made with the understanding that the acceptance of the offer is sought from the person to whom the offer is made. An offer must be sufficiently definite or must call for such definite terms in the acceptance that the consideration promised is reasonably clear.
>
> . . . .
>
> Consideration is an exchange which is bargained for by the parties where there is a benefit to one making the promise or a loss or detriment to the one receiving the promise.

---

[15]     Identical jury instructions were provided for the alter ego claim against Regal LLC and the alter ego claim against Regal Corp.

Promises given in exchange for each other can be valid consideration.

To prevail on the claim for breach of contract, plaintiff must prove all of the following elements. One, the existence of the contract; and, two, plaintiff's performance; and, three, defendants' failure to perform an obligation under the contract; and, four, defendants' failure to perform the legal cause of damage to plaintiff's [sic]; and, five, the damage was of the nature and extent reasonably foreseeable by defendants at the time the contract was entered into.

Finally, the circuit court provided the following jury instructions for the unfair and deceptive acts or practices claim:

To prevail against defendants on the claim of unfair and deceptive acts or practices, plaintiff must prove all of the following elements.

One, plaintiff is a consumer; and, two, defendant engaged in an act or practice that was unfair or deceptive; and, three, the unfair or deceptive act or practice occurred in the conduct of trade or commerce; and, four, that the unfair or deceptive act or practice was a legal cause of damages to plaintiff.

A consumer is an individual who, primarily for personal, family or household purposes, purchases goods or services, attempts to purchase goods or services, is solicited to purchase goods or services, or commits -- money property or services in a personal investment.

An act or practice is unfair if it offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

An act or practice is deceptive if it is a . . . material representation, . . . omission or practice that is likely to mislead consumers acting reasonably under the circumstances.

Plaintiff need not show that defendant intended to deceive plaintiff or that plaintiff was actually deceived. It is sufficient if the representation, omission or practice was likely to deceive. The representation, omission or practice is material if it involves information that is important to consumers and it is likely to affect their choice of or conducting -- conduct regarding a product, service or investment.

17

> An object or practice occurs in the conduct of trade or commerce if it is in the context of business activity or a business transaction.

No objection was made to the jury instructions.

### 4.  Jury Verdict and Award

The jury concluded in relevant part that Regal. Corp breached the DROAs and breached the covenant of good faith and fair dealing implied in the DROAs.  Additionally, the jury found that Regal Corp. and Regal LLC engaged in unfair and deceptive acts or practices.  In response to special interrogatories, the jury also determined that Purdy was the alter ego of both Regal Corp. and Regal LLC.[16]  Accordingly, Purdy was liable for breach of contract, breach of the covenant of good faith and fair dealing, and unfair and deceptive acts or practices.[17]  After

---

[16]    The jury noted that Purdy was the alter ego of Regal Corp. and Regal LLC on the special verdict form:

> VI.    ALTER EGO:  REGAL CAPITAL CORPORATION
>
> A.    Is Jack Purdy the alter ego of Regal Capital Corporation?
>
> (✓) Yes     ( ) No
>
> Please proceed to Section VII.
>
> VII.   ALTER EGO:  REGAL CAPITAL COMPANY, LLC
>
> A.    Is Jack Purdy the alter ego of Regal Capital Company, LLC?
>
> (✓) Yes     ( ) No

[17]    Judgment was entered in favor of Calipjo as follows:

(continued . . .)

(. . . continued)

[W]ith respect to Count 3 of the First Amended Complaint (breach of the Alii Ranch Estates Reservation DROA claim), $1.00 against Defendant Jack Purdy and $1.00 against Defendant Regal Capital Corporation, plus statutory interest currently in the amount of ten percent (10%) per annum until paid in full;

with respect to Count 4 of the First Amended Complaint (breach of the Moana Ranch Estates Reservation DROA claim), $1.00 against Defendant Jack Purdy and $1.00 against Defendant Regal Capital Corporation, plus statutory interest currently in the amount of ten percent (10%) per annum until paid in full;

with respect to Count 11 of the First Amended Complaint (breach of the covenant of good faith and fair dealing regarding the Alii Ranch Estates Reservation DROA claim), $1.00 against Defendant Jack Purdy and $1.00 against Defendant Regal Capital Corporation, plus statutory interest currently in the amount of ten percent (10%) per annum until paid in full;

with respect to Count 11 of the First Amended Complaint (breach of the covenant of good faith and fair dealing regarding the Moana Ranch Estates Reservation DROA claim), $1.00 against Defendant Jack Purdy and $1.00 against Defendant Regal Capital Corporation, plus statutory interest currently in the amount of ten percent (10%) per annum until paid in full;

with respect to Count 10 of the First Amended Complaint (unfair and deceptive trade practices claim), $166,865.00 against Defendant Jack Purdy, $166,875.00 against Defendant Regal Capital Corporation, and $7,500.00 against Defendant Regal Capital Company, LLC, plus statutory interest currently in the amount of ten percent (10%) per annum until paid in full;

with respect to the claim for attorneys' fees and costs, $38,213.46 against Defendant Jack Purdy, $38,213.46 against Defendant Regal Capital Corporation, and $1,559.74 against Defendant Regal Capital Company, LLC, plus statutory interest currently in the amount of ten percent (10%) per annum until paid in full; and

with respect to the monetary judgments entered against both Regal Capital Corporation and Regal Capital Company, LLC, Defendant Jack Purdy shall be joint and severally liable.

Judgment was entered in favor of Regal LLC, and against Calipjo, as follows:

(continued . . .)

entry of the final judgment, Respondents filed a renewed motion for judgment as a matter of law as to all claims. In light of the conflicting evidence introduced at trial, and viewing "the evidence in the light most favorable to the party that secured the jury verdict," the circuit court denied Respondents' renewed motion for judgment as a matter of law.

**B.    ICA Judgment**

On appeal to the ICA, Respondents argued that the circuit court erred in denying their motions for judgment as a matter of law.[18]  They claimed, inter alia, that Calipjo

---

(. . . continued)

[W]ith respect to Count 3 of the First Amended Complaint (breach of the Alii Ranch Estates Reservation DROA claim);

with respect to Count 4 of the First Amended Complaint (breach of the Moana Ranch Estates Reservation DROA claim);

with respect to Count 11 of the First Amended Complaint (breach of the covenant of good faith and fair dealing regarding the Alii Ranch Estates Reservation DROA claim); and

with respect to Count 11 of the First Amended Complaint (breach of the covenant of good faith and fair dealing regarding the Moana Ranch Estates Reservation DROA claim).

[18]    Respondents argued that Purdy was entitled to judgment as a matter of law on the following claims:  breach of contract, breach of the covenant of good faith and fair dealing, and unfair and deceptive acts or practices.  Respondents claimed that, because Purdy was not the alter ego of Regal Corp. and Regal LLC, nor a party to the DROAs, he could not be held liable for breaching the express or implied terms of the agreements.  In addition, because Purdy did not negotiate the terms of the DROAs, Respondents argued that he could not have engaged in unfair and deceptive acts or practices.  The ICA concluded that Purdy was not the alter ego of Regal Corp. or Regal LLC and, therefore, he could not be held liable based on contract

(continued . . .)

20

presented no evidence that Purdy was the alter ego of Regal Corp. and Regal LLC, that Regal Corp. breached the DROAs, or that Regal LLC committed unfair and deceptive acts or practices. Calipjo countered that evidence presented at trial supported the jury's verdict.

The ICA determined that there was no evidence introduced at trial to support the jury's findings that (1) Regal Corp. breached the DROAs, (2) Regal LLC engaged in unfair and deceptive acts or practices, and (3) Purdy was the alter ego of Regal Corp. and Regal LLC.[19] Calipjo, 2017 WL 6547461, at *4-*7.

As to the alter ego claim, the ICA acknowledged that Purdy was the sole owner of Regal Corp. and Regal LLC, however, it found that this fact, alone, was insufficient to support the jury's verdict. Id. at *3-*4. The ICA concluded that the evidence presented at trial did not establish undercapitalization—one factor relevant to whether an individual

_____

(. . . continued)

theories or for unfair or deceptive acts or practices. Calipjo, 2017 WL 6547461, at *4, *6. Additionally, the ICA rejected Calipjo's alternative argument that Purdy was liable for unfair and deceptive acts or practices pursuant to HRS § 480-17(a) (2008), which provides that individual directors and officers of a corporation may be held liable for acts of a corporation that violate the penal provisions of HRS chapter 480, because the jury did not find that Regal Corp. violated penal provisions of HRS chapter 480. Id. at *6.

[19] However, the ICA found there was sufficient evidence to support the jury's finding that Regal Corp. breached the covenant of good faith and fair dealing. Id. at *5.

acts as the alter ego of a company. Id. at *4. It defined undercapitalization as "[t]he financial condition of a firm that does not have enough capital to carry on its business." Id. (quoting Black's Law Dictionary 251 (10th ed. 2014)). The ICA stated that the trial testimony had "nothing to do with [the] capitalization" of the entities and it did not "infer any particular level of capitalization of Regal Corp., let alone undercapitalization such that it would bring about injustice and inequity not to find Purdy to be the alter ego of Regal Corp." Id. Additionally, the ICA held that the transfer of the Ali'i and Moana properties from Regal Corp. to Regal LLC did not constitute a fraudulent transfer or an abuse of the corporate form. Id. It noted that "[t]his case does not involve findings, or even claims, of fraudulent transfer with respect to these transfers. There is no evidence that these transfers rendered Regal Corp. unable to satisfy its corporate debts and obligations." Id. The ICA concluded that Purdy's purported statement that he never intended to sell the properties to Calipjo was insufficient evidence to support a finding of alter ego. Id. In light of these conclusions, the ICA reversed in part the final judgment, concluding that "there was no evidence to support the jury's verdict that Purdy was the alter ego of Regal Corp. and Regal LLC." Id.

22

Because the ICA reversed the jury's finding that Purdy was the alter ego of Regal Corp. and Regal LLC, it reversed the underlying claims and damages awards against Purdy for breach of contract, breach of the covenant of good faith and fair dealing, and unfair and deceptive acts or practices. Id. at *4, *6. The ICA reasoned that absent a finding of alter ego, Purdy could not be held personally liable for the claims because Regal Corp. and Regal LLC shielded him from liability. Id. The ICA explained that "Calipjo's contract claims against Purdy are entirely dependent on the assertion that Purdy is the alter ego of Regal Corp. [and Regal LLC.]" Id. at *4.

The ICA also upheld the judgment against Regal Corp. for unfair or deceptive acts or practices, but held that there was no evidence that Regal LLC had engaged in an unfair or deceptive act or practice.[20] Id. at *6. Having ruled that there was no evidence that Purdy was the alter ego of Regal Corp., and rejecting Calipjo's alternative argument that Purdy was liable for unfair or deceptive acts or practices pursuant to HRS § 480-

---

[20] Because the ICA vacated the circuit court's judgment that Regal LLC committed unfair and deceptive acts or practices, the ICA also vacated and remanded the circuit court's denial of Regal LLC's request for attorneys' fees. Calipjo, 2017 WL 6547461, at *6.

23

17(a),[21] the ICA also held Purdy could not be held liable for

unfair or deceptive acts or practices.[22]  Id.

### III. STANDARD OF REVIEW

This court reviews a trial court's ruling on a motion

for judgment as a matter of law de novo:

> A trial court's ruling on a motion for judgment as a
> matter of law is reviewed de novo.  "A [motion for judgment
> as a matter of law] may be granted only when after
> disregarding conflicting evidence, giving to the non-moving
> party's evidence all the value to which it is legally
> entitled, and indulging every legitimate inference which
> may be drawn from the evidence in the non-moving party's
> favor, it can be said that there is no evidence to support
> a jury verdict in his or her favor."

Ray v. Kapiolani Med. Specialists, 125 Hawai'i 253, 261, 259 P.3d

569, 577 (2011) (internal citations omitted); see also Hawai'i

Rules of Civil Procedure Rule 50(a)(1) ("If during a trial by

jury a party has been fully heard on an issue and there is no

legally sufficient evidentiary basis for a reasonable jury to

find for that party on that issue, the court may determine the

issue against that party and may grant a motion for judgment as

a matter of law against that party with respect to a claim or

---

[21]    See supra note 18, at 20-21.

[22]    The ICA also affirmed the judgment against Regal Corp. for breach
of the covenant of good faith and fair dealing, unfair and deceptive acts or
practices, and treble damages totaling $166,875.00 arising from the unfair
and deceptive acts or practices claim.  Calipjo, 2017 WL 6547461, at *7.
Because these issues are not raised in the application to this court, we
affirm the ICA's judgment in part.

defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.").

## IV. DISCUSSION

A motion for judgment as a matter of law is granted only if there is no evidence to support the jury's verdict. Ray, 125 Hawaiʻi at 261, 259 P.3d at 577. In making this determination, the court must disregard conflicting evidence, give "to the non-moving party's evidence all the value to which it is legally entitled, and indulg[e] every legitimate inference which may be drawn from the evidence in the non-moving party's favor[.]" Id. (internal quotation marks and citation omitted). Applying this standard, we examine the record de novo to determine whether evidence was introduced to support the jury's determination that Purdy is the alter ego of Regal Corp. and Regal LLC, that Regal Corp. breached the DROAs, and that Regal LLC committed unfair and deceptive acts or practices.

### A. The Jury's Verdict that Purdy was the Alter Ego of Regal Corp. and Regal LLC was Supported by Evidence

Courts have identified a variety of factors to determine whether a corporate entity is the alter ego of another, though no single factor is dispositive.[23] Robert's

---

[23] These factors include:

[1] Commingling of funds and other assets, failure to segregate funds of the separate entities, and the

(continued . . .)

(. . . continued)

> unauthorized diversion of corporate funds or assets to other than corporate uses; [2] the treatment by an individual of the assets of the corporation as his own; [3] the failure to obtain authority to issue stock or to subscribe to or issue the same; [4] the holding out by an individual that he is personally liable for the debts of the corporation; [5] the identical equitable ownership in the two entities; [6] the identification of the equitable owners thereof with the domination and control of the two entities; [7] identi[ty] of . . . directors and officers of the two entities in the responsible supervision and management; [8] sole ownership of all of the stock in a corporation by one individual or the members of a family; [9] the use of the same office or business location; [10] the employment of the same employees and/or attorney; [11] the failure to adequately capitalize a corporation; [12] the total absence of corporate assets, and undercapitalization; [13] the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation; [14] the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities; [15] the disregard of legal formalities and the failure to maintain arm's length relationships among related entities; [16] the use of the corporate entity to procure labor, services or merchandise for another person or entity; [17] the diversion stockholder [sic] or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another; [18] the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions; and [19] the formation and use of a corporation to transfer to it the existing liability of another person or entity.

Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transp. Co., 91 Hawai'i 224, 242, 982 P.2d 853, 871 (1999), superseded by statute on other grounds as noted in Davis v. Four Seasons Hotel Ltd., 122 Hawai'i 423, 428 n.9, 228 P.3d 303, 308 n.9 (2010) (alterations in original) (emphasis removed) (citing Associated Vendors, Inc. v. Oakland Meat Co., 26 Cal. Rptr. 806, 813-15 (Cal. Dist. Ct. App. 1962)).  Courts also consider:

> (1) incorporation for the purpose of circumventing public policy or statutes; (2) whether the parent finances the subsidiary; (3) whether the subsidiary has no business or assets except those conveyed to it by the parent; (4) whether the parent uses the subsidiary's property as its own; (5) whether the directors of the subsidiary do not act

(continued . . .)

<u>Hawaii</u>, 91 Hawai'i at 242-43, 982 P.2d at 871-72.  In addition, a two-part test must be satisfied:

> [I]t must be made to appear that [1] the corporation is not only influenced and governed by that person, but that there is such a unity of interest . . . that the individuality, or separateness, of such person and corporation has ceased, and [2] that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice.

<u>Id.</u> at 242, 982 P.2d at 871 (alterations in original) (quoting <u>Associated Vendors</u>, 26 Cal. Rptr. at 813).  Thus, the jury must determine whether there was a "unity of interest" between the individual and the corporation.  <u>Id.</u> (quoting <u>Associated Vendors</u>, 26 Cal. Rptr. at 813).  A "unity of interest" means that "[t]heir objectives are common, not disparate; their general corporate actions are guided or determined not by two separate . . . consciousness, but one[.]"  <u>Id.</u> at 242, 253, 982 P.2d at 871, 882 (quoting <u>Copperweld Corp. v. Indep. Tube Corp.</u>, 467 U.S. 752, 771 (1984)).  The jury must also consider whether maintaining the corporate fiction would "sanction a fraud or promote injustice."  <u>Id.</u> at 242, 982 P.2d at 871 (quoting <u>Associated Vendors</u>, 26 Cal. Rptr. at 813).  Here, entry of

---

(. . . continued)

> independently in the interest of the corporation but take their orders from and serve the parent; and (6) whether the "fiction of corporate entity . . . has been adopted or used to evade the provisions of a statute."

<u>Id.</u> (quoting <u>Kavanaugh v. Ford Motor Co.</u>, 353 F.2d 710, 717 (7th Cir. 1965)).

judgment as a matter of law is proper only if there is no evidence to support the jury's verdict that there was a "unity of interest" between the individual and the corporation and that the corporate fiction resulted in "a fraud or promote[d] injustice." Id. (quoting Associated Vendors, 26 Cal. Rptr. at 813).

In this case, the jury was presented with evidence that Purdy exercised exclusive ownership and control over Regal Corp. and Regal LLC. Purdy testified that he was the sole shareholder, director, and officer of Regal Corp. and the sole member and manager of Regal LLC. This court has held that "sole ownership of all of the stock in a corporation by one individual" is one relevant factor to determine alter ego. Id. (quoting Associated Vendors, 26 Cal. Rptr. at 814). Purdy's testimony supports the jury's determination that Purdy exercised exclusive ownership and control over Regal Corp. and Regal LLC; it constitutes evidence that Purdy was the sole owner and manager of either company.

The jury was also presented with evidence that Regal Corp. and Regal LLC were undercapitalized[24]—another factor relevant to whether Purdy was the alter ego of Regal Corp. and

_____

[24] Undercapitalization is "[t]he financial condition of a firm that does not have enough capital to carry on its business." Black's Law Dictionary 251 (10th ed. 2014).

Regal LLC.  See id.  The ICA concluded that Purdy's "testimony did not evidence or infer any particular level of capitalization of Regal Corp., let alone undercapitalization[.]"  Calipjo, 2017 WL 6547461, at *4.  However, Purdy testified that he transferred the Ali'i and Moana properties from Regal Corp. to Regal LLC for no consideration.  He was unable to identify the value of the transfer.  On cross-examination, Purdy provided testimony supporting Calipjo's claim that Regal Corp. and Regal LLC were undercapitalized:

> Q.  Okay.  So, now, with respect to the actual conveyances from Regal Capital Corporation and Antigua & Barbuda Corporation to Regal Capital Company, you transferred Alii, which is 19 acres, is that correct, at that time?
>
> [Purdy.]  Alii One.
>
> Q.  Okay.  And how much money did Regal Capital Company LLC pay to Regal Capital Corporation for that conveyance?
>
> [Purdy.]  Can you show me a copy of it.
>
> Q.  Well, I can show you the actual title report, but I don't have a number on it.  So I was asking you if you know?
>
> [Purdy.]  It would be a little bit of a guess, but I could give it a try.  I would think maybe $1.2 million, in that range.
>
> Q.  Well --
>
> [Purdy.]  I just can't recall.
>
> Q.  Okay.  Did you actually transfer that money over?  Was there a cash transfer?
>
> [Purdy.]  No.
>
> Q.  How did it work?
>
> [Purdy.]  You have to -- for tax purposes of both companies, you have to value the property.  You'd have to discern a value. And then --

Q.  Would it surprise you to know the Kauai Business Report said it was $36,800?

[Purdy.]  Well, maybe it was just the price of the taxes. No, I would think that would be -- no, that would really surprise me.

Q.  Okay.

[Purdy.]  That would seem like the taxes.

Q.  Well, here's what I want to know.  This is simple.  You got Regal -- the Antigua company owns it, right, and it's worth something?  Okay?

[Purdy.]  Yeah.

Q.  As the fair market value of it.  Right?

[Purdy.]  Yeah.

Q.  And then you transfer from the Antigua company to the LLC, the Hawaii company.  Is that right?

[Purdy.]  Yes.

Q.  Okay.  How much money did the Antigua company give to the Hawaii company to acquire that property?

[Purdy.]  I don't know.

Q.  Okay.

[Purdy.]  (Inaudible) it would have been a tax consideration and whatever the -- I don't know.

THE COURT:  Mr. Purdy, what is the answer?

[Purdy.]:  The answer is today, I don't know.

. . . .

Q.  And then I'll ask you the same question with respect to the Moana Ranch conveyance from Regal Capital Corporation to Regal Capital Company, which, according to the title report I've got, happened on November 7th, 2003.

[Purdy.]  Okay.

Q.  How much money was transferred -- how much money did the LLC, the Regal Capital Company LLC, a Hawaii limited company, give to Regal Capital Corporation for the transfer of the interest in the Moana Ranch property, if you know?

[Purdy.]  Well, I would just say around the amount that we were into the property for.  And in my mind -- but then you say would it surprise me – I'm putting words in my mouth. I would think it would have been transferred in the half-a-million-dollar range.

30

Q. Are you saying that a check for half a million dollars was cut?

[Purdy.] No.

Q. That's what I want to know.

[Purdy.] No.

. . . .

Q. Did you, in your capacity as president or director of the Antigua company, write a check -- strike that. Did you, in your capacity as the president of -- or, excuse me, managing member of the LLC, the buyer of the property, write a check to the Antigua Barbuda Company for the conveyance of either of these properties?

[Purdy.] I did not.

Q. You just conveyed it and had a tax designation on it?

[Purdy.] Yeah, it would have been a book entry in terms of the amount of money, the value that went from one corporation to another, which I think that's pretty commonplace.

(Emphases added.) This testimony constitutes evidence that Purdy was unable to explain whether or not his companies were, in fact, adequately capitalized. For example, though he acknowledged that the cumulative value of the Ali'i and Moana properties was 1.7 million dollars, he did not explain how Regal Corp. derived any value from the transfer of these properties. Purdy admitted that no money was exchanged. He provided answers such as "[y]eah, it would have been a book entry in terms of the amount of money, the value that went from one corporation to another, which I think that's pretty commonplace" and "[y]ou have to -- for tax purposes of both companies, you have to value the property. You'd have to discern a value." Ultimately, this evidence indicates that Regal Corp. was undercapitalized given

that it transferred 1.7 million dollars' worth of assets to Regal LLC for no consideration.  Thus, Purdy's testimony constitutes evidence supporting the jury's verdict.

Further, Purdy's testimony constitutes evidence that there was a "unity of interest" between the Respondents. Robert's Hawaii, 91 Hawai'i at 242, 982 P.2d at 871 (quoting Associated Vendors, 26 Cal. Rptr. at 813).  This supports the jury's determinations that Purdy is the alter ego of Regal Corp. and Purdy is the alter ego of Regal LLC.  In Robert's Hawaii, this court stated that in order to find alter ego, there must be "such a unity of interest . . . that the individuality, or separateness, of such person and corporation has ceased[.]"  Id. (alteration in original) (quoting Associated Vendors, 26 Cal. Rptr. at 813).  In other words, the alter ego's consciousness must guide the company's actions.  See id. at 253, 982 P.2d at 882 (citing Copperweld Corp., 467 U.S. at 771).  Here, Purdy testified that he authorized the transfer of Regal Corp.'s assets because he knew that he could make more profit from a high-end development on the property.  This testimony supports a finding that Purdy's consciousness was guiding Regal Corp.'s actions and objectives because Regal Corp. suffered a detriment as a result of the transfer, while Purdy directly and personally benefitted from it.  Therefore, the jury was presented with evidence of a "unity of interest" between Purdy and Regal Corp.

32

Id. at 242, 982 P.2d at 871 (quoting Associated Vendors, 26 Cal. Rptr. at 813).

In addition, the jury was presented with evidence that allowing Purdy to act as the alter ego of Regal Corp. and Regal LLC would "sanction a fraud or promote injustice."[25]  Id. (quoting Associated Vendors, 26 Cal. Rptr. at 813).  Purdy altered condition C-67 of the Ali'i property DROA to provide himself, the seller, the option to cancel the agreement without providing notice to the buyer.[26]  Purdy testified that "[i]f the buyer had a right to terminate, then I should have that same right" and he directed Summers to add "or Seller" to condition C-67 of the Ali'i property DROA.  Summers told Calipjo that the addition of "or Seller" was Purdy's counteroffer "and if [Calipjo] didn't want to acknowledge this, then he wouldn't have a reservation agreement."  Therefore, Purdy did not merely suggest the incorporation of "or Seller[,]" but he insisted on it as a condition of the DROA.  Moreover, due to the contingency in the Moana property DROA, if Purdy elected to cancel the Ali'i property DROA, which he ultimately did, he automatically

---

[25]    The jury was instructed that two of the essential elements of an alter ego claim are whether "the shareholder exercised control over the corporation in such a way as to harm the plaintiff" and whether "refusal to disregard the corporate entity would subject the plaintiff to unjust loss."

[26]    The alteration read:  "Buyer or Seller may terminate this reservation at any time prior to it becoming a binding contract by written notice to Seller."  (Emphasis added.)

cancelled the Moana property DROA.  Summers testified that Purdy needed an investor for the project "to do the improvements that we planned on doing to the property."  Therefore, testimony regarding Purdy's forceful inclusion of the term "or Seller" may have evidenced his intent to cancel the DROAs because it showed that from the beginning of his dealings with Calipjo, Purdy intended to renege on the Ali'i property DROA.  Evidence was presented at trial that Purdy altered the Ali'i property DROA to remove an essential protection for the buyer.  This indicates that Calipjo would suffer an injustice as a result of Purdy's actions as the alter ego of Regal Corp. and Regal LLC, and supports the jury's verdict.

Additional evidence was presented at trial that Purdy intended to cancel the DROAs and thereby use Regal Corp. and Regal LLC to commit a fraud or an injustice against Calipjo. This supports the jury's determinations that Purdy is the alter ego of Regal Corp. and Regal LLC.  Calipjo testified that Purdy approached him seven years after signing the DROAs and stated that he never intended to sell Calipjo the properties.  Another witness corroborated this testimony.  Therefore, the jury was presented with evidence that Purdy used Regal Corp. and Regal LLC to commit a fraud because he never intended to sell the properties to Calipjo.

"[D]isregarding conflicting evidence, giving to [Calipjo's] evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in [Calipjo's] favor," the record does not support the conclusion that there was no evidence to support the jury's verdict in Calipjo's favor.  Ray, 125 Hawaiʻi at 261, 259 P.3d at 577.

**B.    The Jury's Verdict that Regal Corp. Breached the DROAs is Supported by Evidence**

At trial, the jury was instructed on the essential elements of a contract:  (1) capacity to enter the contract, (2) offer, (3) acceptance, and (4) consideration.  This court has held that "[i]t is well-settled that consideration is an essential element of, and is necessary to the enforceability or validity of, a contract."  Douglass v. Pflueger Hawaii, Inc., 110 Hawaiʻi 520, 534, 135 P.3d 129, 143 (2006), as corrected (May 30, 2006) (quoting Shanghai Inv. Co. v. Alteka Co., 92 Hawaiʻi 482, 496, 993 P.2d 516, 530 (2000), overruled on other grounds by Blair v. Ing, 96 Hawaiʻi 327, 335-36, 31 P.3d 184, 192-93 (2001)).  We define consideration "as a bargained for exchange whereby the promisor receives some benefit or the promisee suffers a detriment."  Id. (quoting Shanghai, 92 Hawaiʻi at 496, 993 P.2d at 530).  Furthermore, "[a] modification of a contract

35

must be supported by new consideration." Shanghai, 92 Hawai'i at 496, 993 P.2d at 530.

Based on the testimony presented at trial, "indulging every legitimate inference which may be drawn from the evidence in [Calipjo's] favor," we cannot say that the jury's finding that Regal Corp. breached the DROAs was not supported by evidence. Ray, 125 Hawai'i at 261, 259 P.3d at 577. Lengthy testimony was offered by Summers, Purdy, and Calipjo regarding the alteration to condition C-67 of the Ali'i property DROA that gave Regal Corp., the seller, the right to cancel the Ali'i property DROA at any time before the Final Condominium Public Report was released. This testimony notably lacks mention of any new benefit to Calipjo for modifying the original agreement. Because the modification to condition C-67 of the Ali'i property DROA was not supported by consideration, it is void. Therefore, there was evidence at trial that Regal Corp. breached the express terms of the original contract when it cancelled the DROAs and the ICA's determination that there is no evidence that Regal Corp. breached the DROAs is error.

C. **The Jury's Verdict that Regal LLC Committed Unfair and Deceptive Acts or Practices is Supported by Evidence**

The ICA concluded that there is no evidence to support a finding that Regal LLC engaged in unfair and deceptive acts or practices. Calipjo, 2017 WL 6547461, at *6. "A deceptive act

36

or practice is '(1) a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances where (3) the representation, omission, or practice is material.'" Hungate v. Law Office of David B. Rosen, 139 Hawai'i 394, 411, 391 P.3d 1, 18 (2017) (brackets omitted) (quoting Courbat v. Dahana Ranch, Inc., 111 Hawai'i 254, 262, 141 P.3d 427, 435 (2006)). "A representation, omission, or practice is considered material if it 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'" Id. (citation omitted). The test for whether an act or omission is deceptive is an objective test, and it turns "on whether the act or omission is likely to mislead consumers, . . . as to information important to consumers . . . in making a decision regarding the product or service." Id. (internal citations and quotation marks omitted) (alterations in original).

Giving the evidence presented at trial "all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in [Calipjo's] favor," it is apparent that the jury could have determined that the acts or omissions of Regal LLC misled Calipjo as to information critical to his position as the buyer of the Ali'i and Moana properties. Ray, 125 Hawai'i at 261, 259 P.3d at 577. Purdy testified that as early as 2000, Regal LLC was heavily

37

involved in the development of the Ali'i and Moana properties.
Just eight months after the parties entered the DROAs on August
12, 2002, Regal Corp. transferred the Ali'i property to Regal LLC
for no consideration.  Regal Corp. and Regal LLC did not notify
Calipjo that the DROAs were cancelled until three months later,
on August 7, 2003.  Thus, there is evidence to support the
jury's conclusion that Regal LLC's role in the development of
the properties, and ultimate ownership of the properties,
involves information that would be important to consumers such
as Purdy, and was likely to affect Purdy's conduct regarding the
DROAs.[27]

### D.    The Underlying Claims Against Purdy are Reinstated

The ICA reversed all claims against Purdy including
breach of contract, breach of the covenant of good faith and
fair dealing, and unfair and deceptive acts or practices.
Calipjo, 2017 WL 6547461, at \*7.  The ICA reasoned that absent a
finding of alter ego, Purdy was not a party to the Ali'i and
Moana property DROAs.  Id. at \*4.  Therefore, he could not be
held liable for breaching the express and implied terms of

---

[27]     Because we vacate the ICA's determination that no evidence
supports the jury's finding that Regal LLC committed unfair and deceptive
acts or practices, we also vacate the ICA's holding that the circuit court
erred in determining that Regal LLC is not entitled to attorneys' fees.
Calipjo, 2017 WL 6547461, at \*6.

either DROA, or unfair and deceptive acts or practices.  Id. at *4, *6.

Accordingly, the ICA erroneously overturned the jury's verdict regarding alter ego and reversed the judgment against Purdy for breach of contract, breach of the covenant of good faith and fair dealing, and unfair and deceptive acts or practices.  This court has held that the alter ego doctrine does not create a separate cause of action, but rather, creates a means for an individual (the alter ego) to be held personally liable for a cause of action against a corporate entity:

> A claim based on the alter ego theory is not in itself a claim for substantive relief, but rather to disregard the corporation as a distinct defendant is procedural.  A finding of fact of alter ego, standing alone, creates no cause of action.  It merely furnishes a means for a complainant to reach a second corporation or individual upon a cause of action that otherwise would have existed only against the first corporation.  An attempt to pierce the corporate veil is a means of imposing liability on an underlying cause of action, such as a tort or breach of contract.  The alter ego doctrine is thus remedial, not defensive, in nature.  One who seeks to disregard the corporate veil must show that the corporate form has been abused to the injury of a third person.

Robert's Hawaii, 91 Hawaiʻi at 241, 982 P.2d at 870 (emphasis in original) (quoting 1 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Private Corporations § 41.10, at 568-81 (perm. ed. 1999)).  Although Purdy was not named as a party to the DROAs, the jury determined that he functioned as the alter ego of Regal Corp. and Regal LLC.  Because the jury found that Purdy was the alter ego of Regal Corp. and Regal LLC, Purdy was

39

held liable for the underlying claims.[28]  See id.  The ICA's

reversal of the final judgment as to these claims was error.

### V.    CONCLUSION

The ICA's holding that no evidence supported the

jury's verdict that Regal Corp. breached the DROAs, Regal LLC

engaged in unfair and deceptive acts or practices, and Purdy was

the alter ego of Regal Corp. and Regal LLC was error.  Because

evidence supported the jury's verdict that Purdy is the alter

ego, he is liable for breach of contract, breach of the covenant

of good faith and fair dealing, and unfair and deceptive acts or

practices.  Accordingly, we affirm in part and vacate in part

the January 24, 2018 judgment of the ICA and reinstate the

circuit court's July 18, 2014 final judgment.

| | |
|---|---|
| Donna E. Richards,<br>Mark R. Zenger<br>for Petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| | /s/ Sabrina S. McKenna |
| Richard E. Wilson<br>for Respondents | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |



---

[28]     On the special verdict form, with respect to the Ali'i and Moana property DROAs, the jury determined that Purdy breached his contractual obligations, failed to act with good faith and fair dealing, and committed unfair and deceptive acts or practices.